**Opinion issued August 14, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00752-CV

————————————

**ANGELA CORNEJO AND CARLOS PORTILLO, Appellants**

**V.**

**STEPHEN J. HILGERS, M.D., Appellee**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Case No. 2012-69538**

---

## O P I N I O N

In this interlocutory appeal,[1] appellants, Angela Cornejo and Carlos Portillo,

challenge the trial court's dismissal of their health care liability claims[2] against

---

1    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(10) (Vernon Supp. 2013).

2    *See id.* § 74.001(a)(13) (Vernon Supp. 2013).

appellee, Stephen Hilgers, M.D.[3]  In two issues,[4] Cornejo and Portillo contend that the trial court erred in dismissing their claims against Dr. Hilgers on the grounds that one of their medical experts is not qualified to opine on the issue of causation and both of their medical expert reports[5] are insufficient as to causation.

We reverse and remand.

## Background

In their amended petition, Cornejo and Portillo allege that on December 2, 2010, Cornejo, who was forty weeks' pregnant, presented at St. Joseph Medical Center with gestational hypertension and headaches.  Dr. Hilgers, an obstetrics and gynecology resident, examined Cornejo and conducted an ultrasound and electronic fetal monitoring, which, at 8:28 p.m., showed increasing contractions and an irregularity in the fetal heart rate.  Nevertheless, Hilgers discharged Cornejo at 8:40 p.m., with instructions to return in four days.

---

[3]  Defendants Mae Kathleen Borchardt, M.D., formerly known as Mae Kathleen Hayes, M.D., John Cecil McBride, M.D., Bridgette Parish, M.D., Danielle Niemeyer, R.N., Jamie Respondek, R.N., Mayoor Bhatt, M.D., Sharon Ann Woodson, R.N., and St. Joseph Medical Center are not parties to this appeal.

[4]  Although Cornejo and Portillo present three issues, their first issue, in which they generally challenge the trial court's order dismissing their claims is, in fact, part of their second and third issues. Accordingly, we address Cornejo and Portillo's two substantive issues.

[5]  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp. 2013).

Cornejo returned to St. Joseph thirteen hours later with elevated blood pressure, headaches, "visual disturbances," and reporting decreased fetal activity. It was determined that the onset of Cornejo's labor occurred at 5:00 a.m. on December 3rd. Nurses J. Respondek and D. Niemeyer placed Cornejo on a fetal heart rate monitor, the readings of which were "reassuring, with good variability."[6] Minutes later, however, there was a "dramatic decrease in fetal heart rate variability," and Cornejo was taken to labor and delivery. At 11:10 a.m., Drs. K. Hayes and B. Parish attended Cornejo, whose membranes were artificially ruptured, and they noted the presence of "thick meconium." Shortly thereafter, the fetal monitor showed "minimal variability" and "late decelerations."[7] At 11:20 a.m., Cornejo signed consent forms for a Cesarean section delivery. St. Joseph personnel then repositioned Cornejo and continued to monitor the fetal heart strip, which showed "occasional late decelerations" with "no accelerations of the fetal

---

[6]  A baby's heart rate is monitored as a means of assessing the baby's oxygenation, including oxygenation of the baby's brain. *See Morrell v. Finke*, 184 S.W.3d 257, 262 (Tex. App.—Fort Worth 2005, pet. denied). A fetal heart monitor strip is read at regular intervals to determine whether the baby's heart rate reflects "hypoxia," a deficiency of oxygen reaching the tissues of the body that could lead to depletion of the baby's oxygen reserves over time, resulting in brain damage. *See id.* A fetal heart monitor strip will be either "reassuring" or "nonreassuring." *See id.* Following a contraction, "reassuring" accelerations show that the baby is oxygenated and tolerating labor. *See id.* at 263. A normal variation in the fetal heart rate is also a reassuring sign of fetal well-being. *See id.* at 262–63.

[7]  In his medical expert report, Dr. Michael L. Hall, Cornejo and Portillo's expert, explained that "[d]ecreased long-term fetal heart rate variability" and "persistent late decelerations" in a baby's heart rate are "nonreassuring" and can be "ominous" signs of hypoxia or asphyxia.

3

heart." Cornejo was sent to the operating room shortly after 1:00 p.m., and her baby was delivered at 1:41 p.m. Although the baby was "blue" and did not cry, she was resuscitated.

Cornejo's baby was later diagnosed with hypoxic-ischemic encephalopathy, a severe, permanent brain injury caused by a lack of oxygen and blood flow.[8] At two months of age, she showed a history of renal injury, secondary to metabolic acidosis and hypoxic injury, and mild spasticity in all extremities. At two years of age, she presented with seizures and significant developmental impairment.

Cornejo and Portillo sued Dr. Hilgers for negligence, seeking damages for past and future medical expenses and mental anguish. To support their claims, they timely filed and served upon Hilgers medical expert reports[9] authored by Michael L. Hall, M.D., Jerry J. Tomasovic, M.D., and Bradley A. Yoder, M.D. Hilgers objected to Drs. Hall's and Tomasovic's reports on the ground that they failed to sufficiently address the element of causation. Hilgers also objected to Hall's report on the ground that Hall is not qualified to opine on the issue of causation. The trial court sustained Hilgers's objections and allowed Cornejo and Portillo thirty days to file and serve amended reports. Cornejo and Portillo stipulated that Dr. Yoder's expert report would not be offered as to Hilgers.

---

[8]     *See Morrell*, 184 S.W.3d at 275 & n.12.

[9]     *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).

4

Cornejo and Portillo then filed and served Dr. Hall's amended medical expert report. As Dr. Hilgers notes in his brief on appeal, Hall's curriculum vitae does not appear in the record before us. In his amended report, however, Hall notes that he is board certified in obstetrics and gynecology, is licensed to practice medicine in the state of Colorado, is affiliated with several hospitals, and serves as an assistant clinical professor at the University of Colorado. Hall further states:

> I am familiar with the standard of care applicable to the management of medical and obstetrical complications in pregnancy, management of labor, use of Pitocin, interpretation of electronic fetal monitoring (EFM), abnormal fetal heart rate patterns, and evidence of fetal hypoxia as predicted by the fetal heart rate pattern. I am also very well aware, that regardless of who is caring for the laboring patient, whether Ob/Gyn, resident, or labor and delivery nurse, that the standards of care regarding recognition of ominous findings on fetal monitor strip are the same. . . .

> As an obstetrician, I have cared for numerous pregnant patients with the same or similar clinical circumstances as those [Cornejo] presented with. . . . I have taught nurses and residents fetal monitoring and have worked closely with nurses and residents for 34 years, and I am familiar with what reasonable and prudent nurses, residents and obstetricians would or would not do in response to abnormal electronic fetal heart patterns and management of Pitocin. The standards of care in the interpretation of electronic fetal monitoring, recognition of abnormal patterns, and recognition of the need for intervention [are] the same across these professionals, although the roles of each may be different in intervening for the same.

> . . . .

> Based on my education, training, years of experience, familiarity with the medical literature and my board certification in OB/GYN, I am familiar with the probable causes of . . . hypoxic-ischemic injuries in babies generally and with the probable causes of the injuries to [Cornejo's baby] in this case. Specifically, during my many years of practice, I . . . read the medical literature, reviewed case

5

studies and have followed the care for babies with the same or similar clinical presentation as [Cornejo's baby]. I have kept current on the medical studies and literature regarding babies who have suffered hypoxic-ischemic encephalopathy (HIE) from events at or around the time of birth. I have also seen infants in my education, training and experience who have suffered from hypoxic-ischemic encephalopathy (HIE) from events at around the time of birth.

Dr. Hall goes on to explain that he reviewed Cornejo's prenatal records, labor and delivery records, and the electronic fetal monitor strip. He notes that the applicable standard of care for Dr. Hilgers was to recognize certain risk factors with which Cornejo presented and are "well known to increase the risk of fetal intolerance to the uterine environment, increasing the foreseeability of progressive hypoxia and ischemia and need for expeditious delivery of the fetus." Specifically, Cornejo, prior to the time that Hilgers discharged her, presented with decreased fetal movement, gestational hypertension, suspected intrauterine growth restriction, and late deceleration on the electronic fetal monitor. Due to the risk factors present, and because there was a "late deceleration just prior to the end of the fetal monitor strip" at 8:28 p.m. on the evening that Hilgers examined Cornejo, Hall opines that Hilgers had a duty to admit Cornejo to the hospital, rather than discharge her, and continue to monitor the fetal heart rate, the fetus for progressive hypoxia and ischemia, and the need to expedite delivery.

Dr. Hall further opines that Dr. Hilgers breached "the standard of care of any resident providing obstetrical services" by:

6

- "failing to recognize the risk factors at the time of the premature discharge on December 2, 2010, discuss those with the 'OB/GYN specialist' and admit [Cornejo] to the Hospital";

- "discontinuing fetal heart rate monitoring on December 2, 2010, in the face of a late deceleration (a potentially ominous finding suggestive of uteroplacental insufficiency given the risk factors discussed above)";

- "failing to continuously monitor the fetal heart rate patterns on the evening and morning of December 2–3, 2010"; and

- "failing to deliver [Cornejo's baby] due to a progressively deteriorating fetal status which would have been evident on fetal monitoring."

He added:

> We know that the deterioration would have been evident given the difference in the quality of the fetal monitor tracing . . . between December 2, 2010 before the late deceleration at the end and the tracing the following morning when she presented again to the Hospital. Tracings do not suddenly become nonreassuring unless there is an acute cord accident that we know did not occur in this case. In reasonable medical probability, there was plenty of opportunity to see the deterioration occur had she been monitored, and any ordinary, reasonably prudent obstetrician (or resident acting under his or her supervision), would have delivered [Cornejo's baby] before she actually presented again the following morning according to the chronology.

As to causation, Dr. Hall opines that Dr. Hilgers "should have known" that the risk factors present in this case "may foreseeably cause fetal intolerance even to normal labor which may induce sufficient stress to produce a lack of blood flow to the fetus (hypoxia), which foreseeably may produce acidosis (asphyxia), which may foreseeably cause brain injury." And he notes that,

7

[Cornejo's baby] suffered progressive hypoxia and acidosis, as a result of the delay in delivery caused by Dr. Hilgers'[s]. . . breaches in the standard of care. Because [Cornejo] was not kept overnight, she arrived in a more critical state, setting into motion a chain of events which required more timely action after [she] returned [the next morning] with a persistently and progressively abnormal electronic fetal monitor pattern which was not resolved.

Dr. Hall further opines that,

more likely than not, had [Cornejo's baby] been delivered by Dr. Hilgers and/or the OB/GYN specialist assigned to supervise him, she would have been neurologically intact at the time of birth, would not have had difficulty with the newborn resuscitation, would not have developed pneumothoraces, would not have had an additional episode of documented severe metabolic acidosis, and would likely be normal today. . . .
. . . .
[T]he care rendered [Cornejo] by Dr. Hilgers was deficient—falling well below the standard of care owed to this patient. . . . Within a reasonable degree of medical probability, the negligent breaches in the standard of care by . . . Dr. Hilgers substantially contributed to the direct and proximate cause of the hypoxic ischemic encephalopathy noted in [Cornejo's baby].

Cornejo and Portillo also filed and served Dr. Hilgers with Dr. Tomasovic's amended expert report. Although Tomasovic's curriculum vitae also does not appear in the record before us, he, in his amended report, notes that he is a board-certified pediatric neurologist and has been in private practice for twenty-eight years. He "remain[s] actively supportive of two major medical center neonatal intensive care units and [has] been involved in the care of neonates and infants who have experienced hypoxic-ischemic encephalopathy and hypoglycemia."

Dr. Tomasovic notes that he met with Cornejo's child on January 15, 2013 to address her "current neurologic condition as it relates to events involving her birth and subsequent treatment, and whether there is medical causation between such treatment" and her condition. After noting his discussion with her parents about the child's behavior and development and his own observations, Tomasovic states that the child's "findings [are] consistent with microcephaly, a mild hemiparesis with motor coordination issues, and an encephalopathic condition with impaired expressive language." He concludes that "it is medically probable" that when she reaches adulthood, Cornejo's child "will not be able to be independent or employable."

After his review of Dr. Hall's report and the medical records of Cornejo and her baby, Dr. Tomasovic observes that "Cornejo was evaluated on December 2nd, 2010, for transient blood pressure elevations which were stable resulting in her discharge home on that date at 20:29 hours." Although he cannot "address whether the standard of care was breached in doing so," he is able to opine that "the late deceleration of the fetal heart most likely relates to the beginning of a period of hypoxia." He further opines that, "to a reasonable degree of medical probability (and in reliance upon the expert opinions of Dr. Hall), . . . [Cornejo's baby] suffered a significant portion of her injuries due to the failure to deliver her before progressive hypoxia and ischemia deprived her brain tissue of well-

oxygenated blood and neuro[l]ogic injury occurred in utero." And, "[h]ad she been monitored throughout the night rather than discharged by Dr. Hilgers and the hospital personnel, . . . her progressive intolerance of the uterine environment would have been evident and the opportunity would have presented itself to deliver her timely (as opined by Dr. Hall) and before permanent [and] irreversible brain damage occurred." "In other words," according to Tomasovic, "had she been delivered before her mother presented again the next morning to the Hospital, she would not have suffered her injuries."

Dr. Hilgers moved to dismiss Cornejo and Portillo's claims on the grounds that Dr. Hall "is not qualified to address causation" and the amended medical expert reports by Drs. Hall and Tomasovic are insufficient as to the element of causation because they are "inherently grounded in speculative assumptions." Specifically, Hilgers argued that the experts' theories that "had [Cornejo] been kept in the hospital longer on 12/2, the fetal heart tracing would, at some point or points that night, have shown a pattern indicative of fetal deterioration," and, "based on the assumed patterns on the heart tracing, at some unspecified time during the night of 12/2 or the early morning of 12/3, a health care provider would have interpreted the situation as requiring a cesarean delivery and proceeded with delivery" were conjectural. After a hearing, the trial court, without stating its

10

reasons, granted Hilgers's motion to dismiss Cornejo and Portillo's health care liability claims.

## Standard of Review

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cnty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

## Sufficiency of Expert Reports

In their two issues, Cornejo and Portillo argue that the trial court erred in dismissing their claims against Dr. Hilgers because, contrary to his assertions, Dr.

Hall is qualified to opine on the issue of causation and both Drs. Hall and Tomasovic adequately address the issue in their amended medical expert reports.[10]

A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (Vernon Supp. 2013); *Gray*, 189 S.W.3d at 858. The report must provide a "fair summary" of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standard, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). The expert report requirement may be satisfied by utilizing more than one expert report, and a court may read the reports together. *See id.* § 74.351(i).

If a defendant files a motion to dismiss challenging the adequacy of a claimant's expert report, a trial court must grant the motion if it appears, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report or is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. *Id.* § 74.351(l); *Scoresby v. Santillan*, 346 S.W.3d 546, 555–56 (Tex. 2011). In setting out the expert's opinions, the report must provide enough information to fulfill two

---

[10] The applicable standard of care and the manner in which Dr. Hilgers allegedly breached that standard are not at issue in this appeal.

purposes: first, it must inform the defendant of the specific conduct the plaintiff has called into question, and, second, it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby*, 346 S.W.3d at 553–54.

### Dr. Hall's Qualifications

In their second issue, Cornejo and Portillo argue that, to the extent the trial court granted Dr. Hilgers's motion to dismiss their claims on the ground that Dr. Hall is not qualified to address the issue of causation, it erred because Hall's extensive expertise and training qualify him "to recognize the risk and to prevent the injury" suffered by Cornejo's baby and "to understand the causal link to" the baby's "neurologic injury" due to Hilgers's breach of the pertinent standard of care. In his motion to dismiss Cornejo and Portillo's claims, Hilgers argued that Hall "is not qualified to address causation" because he "is not certified in neonatology, pediatric neurology, or maternal-fetal medicine." And he complained that Hall "does not treat newborns."

To be qualified to opine on the causal relationship between a defendant-physician's alleged failure to meet an applicable standard of care and a plaintiff's injury, the author of an expert report must be a physician who is qualified to render opinions on such causal relationships under the Texas Rules of Evidence. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5); *see also id.* § 74.403(a) (Vernon 2011) ("[A] person may qualify as an expert witness on the issue of the causal

13

relationship between the alleged departure from accepted standards of care and the injury, harm, or damages claimed only if the person is a physician and is otherwise qualified to render opinions on that causal relationship under the Texas Rules of Evidence.").

An expert witness may be qualified on the basis of knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would "assist the trier of fact" in understanding the evidence or determining a fact issue. TEX. R. EVID. 702. Thus, a plaintiff must show that her expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *Broders v. Heise*, 924 S.W.2d 148, 153–54 (Tex. 1996).

Whether an expert witness is qualified under rule 702 lies within the sound discretion of a trial court. *Id.* at 151–52. Not every licensed physician is qualified to testify on every medical question. *Id.* at 152–53. A physician need not practice in the particular field about which he is testifying so long as he can demonstrate that he has knowledge, skill, experience, training, or education regarding the specific issue before the court that would qualify him to give an opinion on that subject. *Roberts v. Williamson*, 111 S.W.3d at 113. Analysis of the expert's qualifications to opine as an expert on the subject matter of the report is limited to

the four corners of the expert report or its accompanying curriculum vitae. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a); *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex. 2008).

Here, Cornejo and Portillo were required to establish that Dr. Hall is qualified on the basis of "knowledge, skill, experience, training, or education" to offer opinions concerning the causal link between the alleged breaches of the standard of care by Dr. Hilgers and the injuries suffered by Cornejo's baby. *See* TEX. R. EVID. 702; *Roberts*, 111 S.W.3d at 122.

In his brief to this Court, Dr. Hilgers argues that Dr. Hall is not qualified to render an opinion as to causation because he is not a perinatologist, neonatologist, neurologist, "or any other medical specialist who routinely takes care of babies or who diagnoses and treats brain injuries"; "does not say he provides ongoing medical care or treatment to neonates (outside of the delivery process)"; "does not say he diagnoses or treats babies with brain damage"; and "does not identify any specific, relevant training or experience that would qualify him to provide expert opinions about how Dr. Hilgers'[s] conduct on 12/2 caused [Cornejo's baby's] injuries, sustained later." And Hilgers complains that Hall is "not shown to be qualified to address the opinions at the heart of his causation theory: what a fetal monitor tracing 'would have shown.'"

Dr. Hall, in his expert report, explains that he is board certified in obstetrics and gynecology, is licensed to practice medicine in the state of Colorado, is affiliated with several hospitals, and serves as an assistant clinical professor at the University of Colorado. He specifically states that he is "familiar with the standard of care applicable to the management of medical and obstetrical complications in pregnancy, management of labor, . . . interpretation of electronic fetal monitoring (EFM), abnormal fetal heart rate patterns, and evidence of fetal hypoxia as predicted by the fetal heart rate pattern." Hall notes that, as an obstetrician, he has "cared for numerous pregnant patients with the same or similar clinical circumstances" as those Cornejo presented to Dr. Hilgers. Moreover, he has taught residents fetal monitoring and has "worked closely with . . . residents for 34 years." And Hall specifically explained that he is "familiar with what reasonable and prudent" residents and obstetricians "would or would not do in response to abnormal electronic fetal heart patterns."

Dr. Hall further notes that, based on his "education, training, years of experience, familiarity with the medical literature[,] and . . . board certification in OB/GYN," he is "familiar with the probable causes of . . . hypoxic-ischemic injuries in babies generally and with the probable causes of the injuries to [Cornejo's baby] in this case." During his years of practice, he has "read the medical literature, reviewed case studies and . . . followed the care for babies with

16

the same or similar clinical presentation" as Cornejo's baby. Hall has "kept current on the medical studies and literature regarding babies who have suffered hypoxic-ischemic encephalopathy (HIE) from events at or around the time of birth." And he has "seen infants" in his "education, training and experience who have suffered from hypoxic-ischemic encephalopathy (HIE) from events at around the time of birth."

Dr. Hall's report demonstrates that he has specific expertise in the areas of obstetrical complications in pregnancy, management of labor, interpretation of electronic fetal monitoring, abnormal fetal heart rate patterns, and evidence of fetal hypoxia as predicted by fetal heart rate patterns. And he specifically notes that he is familiar, based on his education, training, and experience, with the probable causes of hypoxic-ischemic injuries in babies generally and with the probable causes of the injuries to Cornejo's baby in this case. This is the type of expertise involved in the claims asserted by Cornejo and Portillo in this case.

In *Roberts v. Williamson*, the Texas Supreme Court held that a board-certified pediatrician was qualified to render an expert opinion as to a newborn baby's neurological injuries. 111 S.W.3d at 121–22. There, after their baby suffered brain damage, parents sued two physicians, alleging that a malfunctioning ventilator, delay in treatment, and failure to transfer the baby to a better-equipped hospital combined to proximately cause the baby's injuries. *Id*. at 115. The

17

physicians argued that the parents' expert, Dr. McGehee, a board-certified pediatrician, was not qualified to testify as to the nature and extent of the child's neurological injuries because he was not a neurologist. *Id*. at 121. The court considered that McGehee held certifications in pediatric advanced life-support and advanced trauma life-support, had studied the effects of pediatric neurological injuries, and had extensive experience advising parents about the effects of such injuries. *Id.* at 121–22. Accordingly, it held that the trial court did not err in admitting McGehee's testimony because, although he was not a neurologist, the record reflected that he had experience and expertise regarding the specific causes and effects of the injuries at issue. *Id*. at 122.

In *Livingston v. Montgomery*, parents sued five physicians after their child suffered severe neurological injuries just prior to birth. 279 S.W.3d 868, 870 (Tex. App.—Dallas 2009, no pet.). The parents alleged that the physicians failed to "intervene in the face of fetal distress on non-reassuring fetal heart rate patterns." *Id.* The physicians argued that the parents' expert, an obstetrician, was not qualified to opine "as to causation of neurological injuries or conditions—much less pediatric neurological injuries." *Id*. at 873. The court explained that the issue was not who was qualified to testify about whether a neurologist could have saved the patient's life by treating his neurological injuries. *Id.* at 877. Rather, the causation issue related to the duty of health care providers to *recognize potential*

*harm and take appropriate actions. Id.* Because the parents' expert had experience in managing labor and delivery, his expertise qualified him to opine on the causal relationship between labor and delivery and the complications that stem from labor and delivery, including a newborn's neurological injuries. *Id.*

Here, based on his experience in managing obstetrical complications in pregnancy and labor, interpreting electronic fetal monitoring and abnormal fetal heart rate patterns, and recognizing fetal hypoxia as predicted by fetal heart rate patterns, Dr. Hall is qualified to opine as to the causal relationship between a newborn's injuries and the failure of a resident or obstetrician to recognize complications in pregnancy and take appropriate actions. The law does not require him to be "certified in neonatology, pediatric neurology, or maternal-fetal medicine" or "treat newborns" to be qualified to so opine. Accordingly, we hold that the trial court, to the extent that it granted Dr. Hilgers's motion to dismiss the claims of Cornejo and Portillo on the ground that Hall is not qualified to opine on the issue of causation, abused its discretion. *See Keo v. Vu*, 76 S.W.3d 725, 733 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

We sustain Cornejo and Portillo's second issue.

*Causation*

In their first issue, Cornejo and Portillo argue that the trial court, to the extent it granted Dr. Hilgers's motion to dismiss their claims on the ground that

Drs. Hall and Tomasovic did not adequately address the issue of causation in their amended medical expert reports, erred because what Hilgers's "calls 'speculation' or 'conjecture' is, in fact, the physicians stating to a 'reasonable [degree of] medical probability' what most likely caused" the injuries to Cornejo's baby. In his motion to dismiss Cornejo and Portillo's claims, Hilgers argued that Hall and Tomasovic's amended medical expert reports do not adequately address the element of causation because their causation theory "is inherently grounded in speculative assumptions" and "conjecture."

An expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). In assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report. *Wright*, 79 S.W.3d at 52. "No particular words or formality are required [in the expert report], but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556.

A causal relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omission, the harm would not have occurred. *Costello v. Christus Santa*

*Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). However, an expert report need not marshal all of the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52; *Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.). The expert must simply provide some basis that a defendant's act or omission proximately caused injury. *Id.* at 53. And the expert must explain the basis of his statements and link his conclusions to the facts. *Id.* at 52.

In his amended medical expert report,[11] Dr. Tomasovic notes that he examined Cornejo's child specifically to assess her "current neurologic condition as it relates to events involving her birth and subsequent treatment, and whether there is medical causation between such treatment" and her condition. He

---

[11] The parties dispute whether Drs. Hall's and Tomasovic's original expert reports should be considered with their amended reports in evaluating whether the doctors adequately addressed the causation issue. Dr. Hilgers quotes extensively from the original expert reports and points out inconsistencies between the original and amended reports. Cornejo and Portillo argue that once they submitted amended expert reports, the original reports were supplanted. An amended expert report served after a thirty-day extension granted by the trial court, as here, supersedes any initial report filed by the claimant. *Otero v. Leon*, 319 S.W.3d 195, 204–05 (Tex. App.—Corpus Christi 2010, pet. denied); *HealthSouth Corp. v. Searcy*, 228 S.W.3d 907, 909 (Tex. App.—Dallas 2007, no pet.) (holding that amended expert report "supplants" previously filed report); *see also Packard v. Guerra*, 252 S.W.3d 511, 515–16, 534–35 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (considering previously filed reports that were refiled and "supplemented"). Thus, we consider only the amended expert reports in conducting our analysis.

concludes that his findings are "consistent with microcephaly, a mild hemiparesis with motor coordination issues, and an encephalopathic condition with impaired expressive language" and "it is medically probable" that she "will not be able to be independent or employable."

In regard to causation specifically, Dr. Tomasovic opines that "the late deceleration of the fetal heart most likely relates to the beginning of a period of hypoxia" and "to a reasonable degree of medical probability (and in reliance upon the expert opinions of Dr. Hall), . . . [Cornejo's child] suffered a significant portion of her injuries due to the failure to deliver her before progressive hypoxia and ischemia deprived her brain tissue of well-oxygenated blood and neurolo[g]ic injury occurred in utero." And he emphasizes that, "[h]ad she been monitored throughout the night rather than discharged by Dr. Hilgers and the hospital personnel, . . . her progressive intolerance of the uterine environment would have been evident and the opportunity would have presented itself to deliver her timely (as opined by Dr. Hall) and before permanent [and] irreversible brain damage occurred." "In other words," according to Tomasovic, "had she been delivered before her mother presented again the next morning to the Hospital, she would not have suffered her injuries." He emphasizes that,

> It is a legal fiction rather than a medical reality to suggest that any of the health care providers responsible for making decisions regarding delivery from the evening of December 2, 2010 until the time of [the child's] birth are not responsible, at least in part, for her neurological

injuries because they had not yet occurred. All are complicit in failing to rescue her from a foreseeably progressive hostile uterine environment which was the source of all of her injuries and complications . . . .

In his amended medical expert report, Dr. Hall states his familiarity "with the probable causes of . . . hypoxic-ischemic injuries in babies generally and with the probable causes of the injuries to [Cornejo's baby] in this case." He notes that Dr. Hilgers "should have known" that the risk factors present in this case "may foreseeably cause fetal intolerance even to normal labor which may induce sufficient stress to produce a lack of blood flow to the fetus (hypoxia), which foreseeably may produce acidosis (asphyxia), which may foreseeably cause brain injury." And Hall emphasizes that,

> [Cornejo's baby] suffered progressive hypoxia and acidosis, as a result of the delay in delivery caused by Dr. Hilgers'[s] . . . breaches in the standard of care. Because [Cornejo] was not kept overnight, she arrived in a more critical state, setting into motion a chain of events which required more timely action after [she] returned [the next morning] with a persistently and progressively abnormal electronic fetal monitor pattern which was not resolved.

Dr. Hall further opines that,

> more likely than not, had [Cornejo's baby] been delivered by Dr. Hilgers and/or the OB/GYN specialist assigned to supervise him, she would have been neurologically intact at the time of birth, would not have had difficulty with the newborn resuscitation, would not have developed pneumothoraces, would not have had an additional episode of documented severe metabolic acidosis, and would likely be normal today. . . .
>
> . . . .

23

[T]he care rendered [Cornejo] by Dr. Hilgers was deficient—falling well below the standard of care owed to this patient. . . . Within a reasonable degree of medical probability, the negligent breaches in the standard of care by . . . Dr. Hilgers substantially contributed to the direct and proximate cause of the hypoxic ischemic encephalopathy noted in [Cornejo's baby].

Further, Hall explains in great detail how the effects of hypoxia and asphyxia are cumulative and progressive, the role of fetal heart monitoring, and the medical relationship between the late deceleration on the monitor in this case and the injuries suffered by Cornejo's baby.

In his appellate brief, Dr. Hilgers argues, as he did in his motion to dismiss, that Drs. Hall's and Tomasovic's expert reports are insufficient because their "proximate causation theory . . . is inherently grounded in speculative assumptions." Specifically, he characterizes their causation theory thusly: "had [Cornejo] been kept in the hospital longer on 12/2, the fetal heart tracing would, at some point or points that night, have shown a pattern indicative of fetal deterioration," and, "based on the assumed patterns on the heart tracing, at some unspecified time during the night of 12/2 or the early morning of 12/3, a health care provider would have interpreted the situation as requiring a cesarean delivery and proceeded with delivery." Hilgers notes that Tomasovic asserted no "identifiable injury" to Cornejo's baby during his treatment and neither expert asserted that "the standard of care required [him] to deliver [Cornejo's baby] during his care."

24

In their reports, however, Drs. Hall and Tomasovic do more than "speculate." They explain the link between the specific injuries suffered by Cornejo's baby and Dr. Hilgers's alleged failure to recognize Cornejo's risk factors and the late deceleration on the fetal heart monitor, and his failure to take action— by admitting Cornejo to the hospital and continuing the fetal monitoring. *See Jelinek*, 328 S.W.3d at 539–40 ("[T]he expert must . . . explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented."). Hall opines that Hilgers's failure to comprehend the dangers and take appropriate action constituted a substantial factor in bringing about the injuries suffered by Cornejo's baby and, absent such omission, the harm would not have occurred. Likewise, Tomasovic agrees that had Cornejo's baby been monitored throughout the night, rather than discharged by Dr. Hilgers and the hospital personnel, "her progressive intolerance of the uterine environment would have been evident and the opportunity would have presented itself to deliver her timely (as opined by Dr. Hall) and before permanent [and] irreversible brain damage occurred." Although neither Hall nor Tomasovic opines that a specific injury to Cornejo's baby occurred during Hilgers's treatment of Cornejo on December 2nd, it is sufficient that, in their reports, the experts "state[] a chain of events that begin with a health care provider's negligence and end in personal injury." *McKellar v. Cervantes* 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.); *see Patel v. Williams*, 237

25

S.W.3d 901, 905 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Costello*, 141 S.W.3d at 249.

In *McKellar*, Cervantes was a patient of Dr. McKellar and saw him regularly for prenatal care of her high-risk twin pregnancy. 367 S.W.3d at 481. McKellar admitted Cervantes to the hospital during the course of her pregnancy with suspicion of preeclampsia. *Id.* When the twins were delivered via Caesarean section the day after admission, one of the babies, "Alek," was diagnosed with encephalopathy. *Id.* Cervantes brought a health care liability claim against McKellar, and her expert opined in his report that when a patient is admitted with Cervantes's conditions, the standard of care mandated that the fetal well-being be assessed upon admission, yet Cervantes was not placed on an external fetal monitor until more than twenty-eight hours after admission. *Id.* at 487. The expert opined that McKellar's failure to expeditiously discover and address the recurring variable decelerations with absent long-term variability in Alek's heart rate resulted in brain damage. *Id.* at 486. The court of appeals held that the report sufficiently put McKellar on notice of the conduct about which Cervantes complained and further provided the trial court with a basis to conclude that her claim against McKellar had merit. *Id.* at 490.

We conclude that Drs. Hall and Tomasovic, in their amended medical expert reports, provided a fair summary of the causal relationship between Dr. Hilgers's

failure to meet the appropriate standard of care and the injuries suffered by Cornejo's baby. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Thus, the reports presented an objective, good faith effort to comply with the statute. *Id.* § 74.351(l); *Scoresby*, 346 S.W.3d at 555–56. Accordingly, we hold that the trial court, to the extent that it granted Hilgers's motion to dismiss the claims of Cornejo and Portillo on the ground that the reports did not adequately address the issue of causation, abused its discretion.

We sustain Cornejo and Portillo's first issue.

### Conclusion

We reverse the order of the trial court and remand the case to the trial court for further proceedings not inconsistent with this opinion.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Sharp.