In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**No. 09-18-00070-CV**
_____

**DEBORAH HENDRYX AND KPH-CONSOLIDATION, INC.
D/B/A KINGWOOD MEDICAL CENTER, Appellants**

**V.**

**CAROLINA DUARTE, INDIVIDUALLY AND AS NEXT FRIEND
AND PERSONAL REPRESENTATIVE OF THE ESTATE
OF BABY BOY DUARTE, AND ISRAEL DUARTE, Appellees**

**On Appeal from the 410th District Court
Montgomery County, Texas
Trial Cause No. 17-05-05997-CV**

**MEMORANDUM OPINION**

In this interlocutory appeal, we are asked to decide whether the trial court

abused its discretion by denying a hospital's and a physician's respective motions to

dismiss a lawsuit filed by Carolina and Israel Duarte, which involved health care

1

liability claims.[1] In their respective appeals, the hospital and the physician argue that the expert report, filed by the Duartes, failed to meet the expert report requirements found in the Texas Medical Liability Act (hereinafter, "the Act").[2] Because the expert report and accompanying resume, which listed the expert's qualifications, allowed the trial court to conclude that the report met the requirements in the Act, we overrule the appellants' issues and uphold the trial court's order denying the motions to dismiss.

## Background

Carolina's baby died on May 16, 2015, approximately six hours after he was born. The expert medical report, filed by the Duartes, states that the baby died due to being deprived of oxygen and blood when he was born in a prolonged "breech presentation."[3] Just under two years after the baby died, Carolina, her husband, and

---

[1] Carolina sued the defendants individually and as Baby Boy Duarte's next friend and personal representative. Her husband, Israel, sued the defendants as the baby's father.

[2] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*) (West 2017) (requiring a court to grant a motion challenging the adequacy of an expert report if the report does not represent an objective good faith effort to comply with the definition of an expert report, as provided by the Act).

[3] We note that a "breech presentation" is a presentation of the fetus in which the baby's buttocks or feet arrive first at the mother's uterine cervix. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 274 (2002).

their son's estate sued KPH-Consolidation, Inc. d/b/a Kingwood Medical Center and Dr. Deborah Hendryx, the hospital and the doctor involved in the baby's delivery.

In their original petition, the Duartes alleged that Kingwood Medical and Dr. Hendryx were negligent for allowing Carolina to deliver the baby via a vaginal delivery instead of delivering the baby by cesarean section.[4] In July 2017, the Duartes served the hospital and Dr. Hendryx with an expert medical report, authored by Dr. William E. Roberts. Dr. Roberts attached his resume to his report. In his report, Dr. Roberts explained why he believed he had the qualifications required to render opinions about the care that Carolina received from Dr. Hendryx and Kingwood Medical. The report contains Dr. Roberts' opinions, which are critical of the care Kingwood Medical and Dr. Hendryx provided Carolina. The report also explains how the doctor and the hospital violated the standards of care that apply to patients who present with signs and symptoms like those Carolina had when she arrived, by ambulance, at Kingwood Medical in May 2015 to deliver her baby. According to Dr. Roberts' report, Carolina's baby would have survived delivery had he been delivered via cesarean.

---

[4] A "cesarean" is "a surgical operation through the walls of the abdomen and uterus for the purpose of delivering the young of a human[.]" WEBSTER'S THIRD NEW INT'L DICTIONARY 367 (2002).

After the Duartes served Kingwood Medical and Dr. Hendryx with Dr. Roberts' report, Dr. Hendryx and Kingwood Medical filed motions to dismiss the case. In their motions, both Kingwood Medical and Dr. Hendryx challenged Dr. Roberts' qualifications to offer opinions as an expert, asserting that Dr. Roberts was not qualified because he was not actively practicing medicine or providing health care when Carolina delivered the baby or when the Duartes filed their suit.

Dr. Roberts' report and resume contain information that is relevant to his qualifications as an expert. The information in the report and the resume shows that Dr. Roberts is currently licensed to practice medicine in Tennessee, that he has specialties in obstetrics and gynecology, and that he is a subspecialist in maternal fetal medicine. Dr. Roberts holds board certifications from the American Board of Obstetrics and Gynecology. He first received his board certification in 1981 and has been recertified since then in the field of obstetrics and gynecology, and in his subspecialty of maternal fetal medicine.

Dr. Roberts' resume reflects that he has authored or co-authored two books in the fields of his specialties, authored or co-authored eighteen chapters in other books that were published in the field of obstetrics, and authored or co-authored eighty-three journal articles, published on subjects relevant to his certifications. Dr. Roberts has also authored or co-authored 104 abstracts in fields that involved his specialties.

4

The resume Dr. Roberts attached to his report contains information about his employment history. The resume shows that Dr. Roberts completed an obstetrics internship and residency at Keesler Air Force Base, in Mississippi, and that he served as the chief of the obstetrics service at both Travis Air Force Base, in California, and at Keesler Air Force Base. Dr. Roberts previously held a teaching position as professor in the obstetrics and gynecology departments at the University of Mississippi, as chief and then chair of the obstetrics department at Keesler Air Force Medical Center, and he served as vice chairman of the obstetrics and gynecology department at Lehigh Valley Medical Center in Allentown, Pennsylvania. Between 2007 and 2012, Dr. Roberts worked in the division of maternal fetal medicine for Erlanger Health System in Chattanooga, Tennessee, while serving as a professor at the University of Tennessee School of Medicine. Currently, Dr. Roberts is employed by "Perinatal Consultants." Dr. Roberts' resume and report, however, contain no further details about what his position with Perinatal Consultants entails.

The report at issue shows what records Dr. Roberts reviewed in forming his opinions in the Duartes' case. He reviewed records from Carolina's treating obstetrician, Northeast Ob/Gyn Associates, records from Cypress Creek EMS (the organization that transported Carolina to the hospital), and the preliminary and

amended autopsy reports on Carolina's baby, which states the cause of the baby's death in medical terms.

Dr. Roberts' report includes his opinions on the medical care Carolina received from the hospital and Dr. Hendryx on May 16, 2015. Dr. Roberts' opinions are premised on the fact, as shown in Carolina's medical records, that Carolina's baby was in a breech position at birth. The records Dr. Roberts reviewed also show the baby was believed to be in a breech position when Carolina was last seen by her treating obstetrician, more than a week before she delivered her baby. According to Dr. Roberts, Carolina's medical records show that in early April 2015, Carolina's treating obstetrician determined that Carolina's baby was not in a head-down position in her womb. Carolina saw her treating obstetrician again on May 5, 2015, eleven days before she went to Kingwood Medical, where she delivered the baby. The treating obstetrician's records show that Carolina was thirty-four weeks pregnant when last seen, but that her baby had still not turned in her womb. According to Dr. Roberts' report, Carolina's obstetrician told her of "the continued fetal malpresentation and the need for a cesarean delivery if it persists[.]" Carolina's obstetrician advised Carolina to contact the labor and delivery unit of the hospital should she experience the symptoms of labor.

6

Dr. Roberts' report contains information relevant to the day Carolina went into labor. His report notes that Carolina did not immediately go to the hospital when she began experiencing labor pains. Instead, she waited until 11:45 p.m., on May 15, 2015, before calling for an ambulance. Dr. Roberts then notes that the records of Cypress Creek EMS state that Carolina informed the emergency responders who came to her home that her baby was not in a head-down position based on the information she received from her obstetrician. The Cypress Creek records also show that Carolina told the emergency responders that she was having contractions every five minutes. Cypress Creek EMS took Carolina to Kingwood Medical's labor and delivery unit, which admitted her on May 16, 2015, at 12:30 a.m.

Dr. Roberts' report also mentions what he found significant in Kingwood Medical's records. Upon Carolina's arrival at the hospital, Carolina was seen by a nurse. The nurse noted that Carolina's cervix was completely effaced and dilated, at eight centimeters. Around 12:42 a.m., Kingwood Medical notified Dr. Hendryx, the obstetrician who was on-call that night, that Carolina had been admitted to the hospital. At 12:47 a.m., Carolina requested that the nurse perform an ultrasound, but the nurse who performed the test noted in the hospital's records that she was unable to determine the baby's position in Carolina's womb. At 12:53 a.m., the nurse called Dr. Hendryx and asked that the doctor "perform the ultrasound to determine fetal

7

position." At 1:00 a.m., according to Dr. Roberts' report, the hospital records show that Dr. Hendryx was "at bedside and confirm[ed] the breech presentation." At 1:01 a.m., Dr. Hendryx called for an emergency cesarean. The hospital's records, according to Dr. Roberts' report, show that Dr. Hendryx and the nurses were ready to perform the cesarean at 1:27 a.m., but were on standby because the anesthesiology personnel needed to assist in the surgery had not yet arrived. At 1:31 a.m., Carolina's records show she began pushing uncontrollably and that she delivered the baby, buttocks first. Although Carolina's baby apparently survived his breech delivery, he required emergency medical care. When examined at the nursery, the baby's eyes were fixed and dilated, and he was unresponsive to pain. Kingwood Medical transferred the baby to another hospital, where he was pronounced dead around 7:30 a.m. According to Dr. Roberts' report, an autopsy on the baby shows the baby died of "'global hypoxic ischemia of the brain in the setting of breech presentation with prolonged delivery.'"

Alleging that the negligence of Dr. Hendryx and Kingwood Medical caused the baby's death, the Duartes sued Dr. Hendryx and Kingwood Medical, alleging that they failed to timely and adequately assess Carolina's condition, failed to timely provide her with the care she needed for her condition, and failed to timely and adequately diagnose her condition. The petition also alleges that the acts and

8

omissions of Dr. Hendryx and Kingwood Medical proximately caused the baby's death.

After the Duartes served the defendants with Dr. Roberts' report, Dr. Hendryx objected to it on the ground that the report showed that Dr. Roberts, as of October 2012, was no longer actively engaged in the practice of medicine. Kingwood Medical objected to Dr. Roberts' report for additional reasons, claiming that the information Dr. Roberts included with his report failed to show that Dr. Roberts was qualified to express opinions about the care Carolina received from the hospital. Additionally, Kingwood Medical argued that Dr. Roberts was no longer actively practicing medicine as a health care provider. Finally, Kingwood Medical objected to Dr. Roberts' report because his opinions about how the hospital's acts or omissions caused the baby's death were overly conclusory.

After the Duartes failed to amend or supplement Dr. Roberts' report, Dr. Hendryx and Kingwood Medical moved to dismiss the Duartes' claims. In late January 2018, the trial court conducted a hearing on the defendants' respective motions to dismiss. Following the hearing, the trial court denied both motions. In its order, the trial court found that Dr. Roberts' report satisfied the expert report requirements in the Act.[5] The trial court also found that, to the extent there were any

[5] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2017).

9

deficiencies in the information that Dr. Roberts provided about whether he was actively practicing medicine, "good reason [exists] to admit [his] testimony based upon his extensive years of experience, training and teaching in the field at issue in this case." Thereafter, Kingwood Medical and Dr. Hendryx exercised their rights to pursue interlocutory appeals from the denial of their motions.[6]

## Issues

In their appeals, both Dr. Hendryx and Kingwood Medical contend that Dr. Roberts failed to establish he is actively practicing medicine to author an expert report that complies with the requirements of the Act.[7] Unlike Dr. Hendryx, whose only complaint concerns whether Dr. Roberts was actively practicing medicine as required by the Act, Kingwood Medical also contends that Dr. Roberts failed to show that he is knowledgeable about the standards of care applicable to a hospital's nursing staff and that his opinions about what caused the baby's injury and death are overly conclusory.

## Standard of Review

In appeals from rulings on expert reports in health care liability cases, a trial court's ruling on a defendant's motion to dismiss is reviewed by the appellate court

---

[6] *See id*. § 51.014 (a)(9) (West Supp. 2018).

[7] *See id*. §§ 74.401, 74.402 (West 2017).

10

under an abuse-of-discretion standard.[8] "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles."[9] When the plaintiff's case is subject to the Act, trial courts may be found to have abused their discretion in ruling on motions to dismiss when the record before the appellate court demonstrates that the trial court failed to analyze or apply the law correctly.[10] Absent an abuse of discretion, an appellate court may not substitute its judgment for the judgment the trial court made on the motion.[11] Moreover, just "because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred."[12]

---

[8] *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877-78 (Tex. 2001).

[9] *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

[10] *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

[11] *See In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 698 (Tex. 2015) (citing *Walker*, 827 S.W.2d at 839-40); *Wright*, 79 S.W.3d at 52.

[12] *Palladian Bldg. Co., Inc. v. Nortex Found. Designs, Inc.*, 165 S.W.3d 430, 433 (Tex. App.—Fort Worth 2005, no pet.) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)).

The Act requires that plaintiffs suing health care providers for medical malpractice must file an "expert report" not later than the 120th day after the date the health care provider answered the suit.[13] Under the Act, an "expert report" is a written report by an expert that provides a fair summary of the expert's opinions, as of the date of the report, about the standards of care that apply to the health care providers, the manner in which the medical care provided to the patient failed to meet that standard, and how the medical provider's failure to meet the required standard of care caused the patient's injury.[14] The Texas Supreme Court has explained that, to comply with the Act, the report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit."[15] Reports authored by physicians or other medical experts that do no more than provide conclusory statements about the standard of care that applies, how the provider breached the standard, and causation

---

[13] Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

[14] *Id.* § 74.351(r)(6).

[15] *Palacios*, 46 S.W.3d at 875.

do not fulfill the purposes of the Act.[16] Instead, under the Act, "'the expert must explain the basis of his statements to link his conclusions to the facts.'"[17]

Recently, the Texas Supreme Court explained that "the purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims."[18] After noting the report's purpose, the Court then explained that in ruling on motions to dismiss health care liability claims, the trial court "need only find that the report constitutes a 'good faith effort' to comply" with statutory requirements, as the expert, in the report, is not required to "'marshal all the claimant's proof[.]'"[19]

In deciding whether an expert's report in a health care liability case is adequate to comply with the requirements of the Act, courts are to "consider only the information contained within the four corners of the report."[20] Thus, as to a health care provider's complaint that a report fails to adequately explain how the provider

---

[16] *Id.* at 879.

[17] *Wright*, 79 S.W.3d at 52 (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)).

[18] *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam).

[19] *Id.* (quoting *Palacios*, 46 S.W.3d at 878-79).

[20] *Id.* (citing *Palacios*, 46 S.W.3d at 878).

13

caused the patient's injury, courts should focus on "whether the expert has explained how the negligent conduct caused the injury. Whether this explanation is believable should be litigated at a later stage of the proceedings."[21]

## Analysis

*Qualifications*

As both Dr. Hendryx and Kingwood Medical argue that Dr. Roberts was not qualified to render opinions about Carolina's care because he was no longer actively engaged in practicing medicine, we address their arguments about whether the trial court abused its discretion by finding he is actively practicing medicine before addressing Kingwood Medical's remaining issues. In evaluating an expert's qualifications, the qualifications the expert possesses must be evident from the four corners of the report and from the resume that accompanies the expert's report.[22] We use an abuse-of-discretion standard when reviewing the trial court's decision that an expert in a health care liability case has the qualifications that are required to allow

---

[21] *Id.* at 226.

[22] *See Palacios*, 46 S.W.3d at 878; *Christus Health Se. Tex. v. Broussard*, 267 S.W.3d 531, 536 (Tex. App.—Beaumont 2008, no pet.).

the expert to express opinions about whether the medical care that a patient received from the health care provider violated the standards that apply to the provider.[23]

To qualify as an expert in a health care liability claim against a physician, the Act requires the expert to be a physician who

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.[24]

The Act goes on to define the terms "practicing medicine" as including, but are not limited to, "training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians."[25] In assessing the expertise of individuals who author reports for health care liability claims against physicians, trial courts are authorized to consider whether the author of the report is

---

[23] *Cornejo v. Hilgers*, 446 S.W.3d 113, 121 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (citing *Broders v. Heise*, 924 S.W.2d 148, 151-52 (Tex. 1996)).

[24] Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a).

[25] *Id.* § 74.401(b).

15

"board certified or has other substantial training or experience in an area of medical practice relevant to the claim"[26] and whether the author is "actively practicing medicine in rendering medical care services relevant to the claim."[27] With respect to whether the author of an expert report that is filed in a health care liability claim is qualified to express opinions on causation, whether the defendant in the case is a physician or a hospital, the Act requires the report's author to be "a physician who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence[.]"[28]

Section 74.402 of the Act addresses the qualifications for experts who author expert reports in health care liability cases that are critical of the care provided to patients by hospitals. To qualify as an expert on the subject of the medical care a patient received at a hospital, the Act states the person may qualify as an expert witness only if the person

> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

---

[26] *Id.* § 74.401(c).

[27] *Id.*

[28] *Id.* § 74.351(r)(5)(C).

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.[29]

The term "'practicing health care'" is defined in the Act *to include* "training health care providers in the same field as the defendant health care provider at an accredited educational institution[,]" or "serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider."[30] Nevertheless, as to hospitals, the Act allows courts to find that an individual who is practicing medicine in a field of practice that involves the same type of treatment involved in the claim as the treatment provided by the health care provider to have the qualifications needed to be knowledgeable about the standards of care that apply to hospitals.[31] In determining whether the author of a report is qualified to express opinions about a health care provider, and if the author's qualifications are based on his training and experience, the Act authorizes courts to consider whether the person who authored the expert report is "certified by a

---

[29] *Id.* § 74.402(b).

[30] *Id.* § 74.402(a) (emphasis added).

[31] *Id.* § 74.402(b)(1).

17

licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim[.]"[32] As to hospitals, the Act provides that trial courts also consider if the author of a report critical of a hospital "is actively practicing health care in rendering health care services relevant to the claim."[33]

Dr. Roberts' expert report and resume show that before October 2012, he was actively involved in and had a great deal of experience writing, teaching, and practicing medicine in the field of obstetrics, including the more specialized field of high-risk pregnancies. His report shows that currently, he works as a consultant in the field of perinatal medicine. As a consultant in that field, the trial court could have inferred that Dr. Roberts consults on medical matters that arise in a period immediately before or after a baby's birth. Nevertheless, the name "Perinatal Consultants" does not reveal whether Dr. Roberts has consulted with patients and doctors (as opposed to consulting only with lawyers) on matters that concern childbirth, either in May 2015, when Carolina was treated at Kingwood Medical, or in January 2017, when he signed the report.

---

[32] *Id.* § 74.402(c).

[33] *Id.*

18

The Texas Supreme Court has acknowledged that not every licensed medical doctor is automatically qualified to provide a court with an opinion on all medical matters.[34] Nevertheless, the Court cautioned lower courts that the Act's qualifications test "'should not be too narrowly drawn[.]'"[35] The Court explained that the criteria spelled out in the Act "cannot be rigidly applied because it is expressly nonexclusive."[36] As to the requirement in the Act that a physician be actively practicing medicine at the time identified in the Act, the term "practicing medicine" is defined to include (but is not limited to) "serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians."[37]

The information that Dr. Roberts provided to the trial court shows that he is currently licensed, that he is board certified in multiple fields relevant to delivering babies, and that he is currently consulting in the field of medicine that is relevant to the Duartes' claims. Currently, Dr. Roberts consults on matters involving new-born

---

[34] *Benge v. Williams*, 548 S.W.3d 466, 472 (Tex. 2018) (quoting *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006) (per curiam)).

[35] *Id.*

[36] *Id.*

[37] Tex. Civ. Prac. & Rem. Code Ann. § 74.401(b).

19

babies, a field that is directly relevant to the issues that are involved in the Duartes' case. We conclude the trial court was not required to rigidly apply the qualifications test by assuming that Dr. Roberts consults only with lawyers and to assume that he does not consult with doctors or other health care providers on matters involving perinatal medicine.

Nonetheless, even if the information the trial court had about Dr. Roberts' consulting work was incomplete, the Act gave the trial court the right to excuse the active practice requirement if, "under the circumstances, the court determines that there is a good reason to admit the expert's testimony."[38] Here, the trial court specifically found that the exception applied, basing its decision on Dr. Roberts' experience training others and teaching in the field of medicine that is relevant to the issues in dispute.[39] The trial court's decision to relax the active practice requirement is stated on the record, and the trial court did not abuse its discretion by relaxing the active practice requirement under the circumstances in this case.[40]

---

[38] *Id*. §§ 74.401(d), 74.402(d).

[39] The trial court's order states that "[t]o the extent there is any deficiency [in the information Dr. Roberts provided in his report about his qualifications], particularly in regards to '[p]racticing medicine' this Court finds good reason to admit William E. Robert[s], M.D.'s testimony based upon his extensive years of experience, training[,] and teaching in the field at issue in this case."

[40] *Id.* §§ 74.401(d), 74.402(d).

In its brief, Kingwood Medical contends the trial court abused its discretion relaxing the active practice of medicine requirement because the Legislature never intended the exception to apply unless, from the information the expert provided to the court, the court could positively determine that the expert was in fact no longer actively practicing medicine. Kingwood Medical argues the exception does not apply when the author of the expert report simply "failed to satisfy the criteria of [section 74.402,] subsections (a) to (c)[,]" which are the subsections that contain the criteria courts are to follow in deciding whether an expert is "practicing health care."

We disagree that the exception, found in subsection (d), applies only when the information before the court about a physician who authors an expert report affirmatively shows that the physician is no longer practicing medicine. Subsection (d) allows trial courts to depart from the other criteria the Legislature set out in subsections (a)-(c) if the trial court finds that "there is good reason to admit the expert's testimony," and it states that reason on the record.[41] Put simply, the Legislature did not restrict the way trial courts apply the exception to prevent the trial court from applying it under the circumstances that were before it here.

---

[41] *Id.*

Additionally, Kingwood Medical argues that the information that Dr. Roberts provided to the trial court fails "to establish he has knowledge of the standard of care" that applies to the hospital "in this situation." Dr. Roberts' report, however, states that he has "a thorough understanding of all standards of care applicable in this case through [his] knowledge, training, and experience." The trial court could reasonably construe Dr. Roberts' statement about his knowledge of the standard of care to mean that he was familiar with the standard of care that applies to hospitals based upon his experience as a board-certified obstetrician, his experience as the chief of obstetrics and experience as chairman of the obstetrics department when he worked at hospitals, his experience writing books and articles, and his experience teaching other physicians about the care a mother needs to allow a baby to survive the mother's high-risk pregnancy.[42] We conclude the trial court did not abuse its discretion by finding Dr. Roberts possessed the qualifications needed to author an expert report critical of the care that Carolina received from Kingwood Medical.

---

[42] *See Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 198 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("If the doctor is familiar with the standard of care for other health care providers based on experience working with or supervising them, then he can be qualified to render an opinion."); *see also Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace*, 278 S.W.3d 552, 558-59 (Tex. App—Dallas 2009, no pet.); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 814 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

*Causation*

Lastly, Kingwood Medical argues that because Dr. Roberts' opinions on causation are conclusory and speculative, the trial court should have agreed with its claims that his report did not constitute a good faith effort to comply with the requirements of the Act.[43] Kingwood Medical's argument is premised on its apparent belief that Dr. Roberts' opinions about the hospital's care revolve entirely around his assumption that Cypress Creek's emergency responders passed on the information to the hospital's nurses that Carolina's baby was not in a head-down position in her womb. Kingwood Medical concludes that Dr. Roberts' criticisms about the hospital's care, as to causation, were based entirely on that one assumption.

To comply with the causation requirements in the Act, the physician who authors the expert report must link his conclusions to the facts involved in the patient's treatment.[44] While Kingwood Medical assumes that Dr. Roberts relied entirely on an assumption that the emergency responders told the nurses that Carolina told them her baby was in a breech position at the last appointment she had with her obstetrician, the trial court could have reasonably concluded that Carolina

---

[43] *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*).

[44] *See Wright*, 79 S.W.3d at 53.

23

gave the nurses that same information after she arrived at the hospital. For example, Dr. Roberts' report indicates that Carolina told one of Kingwood Medical's nurses that she wanted them to perform an ultrasound. From this information, the trial court could reasonably infer that Carolina told the nurses that she feared her baby was not properly positioned in her womb. Dr. Roberts' report, when read as a whole, suggests the nurses obtained information about the baby's position but then failed to act in a timely manner to pass that information on to Dr. Hendryx. In evaluating Kingwood Medical's arguments, the trial court was not required to focus on any one statement in Dr. Roberts' report. Instead, the trial court was entitled to read the report in its entirety, and in context, in determining whether Dr. Roberts' report established that the Duartes have potentially meritorious claims.[45]

When explaining causation "the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'"[46] Here, the trial court could have reasonably found that Dr. Roberts' report represented a good faith effort to explain how the hospital's acts and omissions proximately caused the baby

---

[45] *See Abshire*, 563 S.W.3d at 223; *Benavides v. Garcia*, 278 S.W.3d 794, 799 (Tex. App.—San Antonio 2009, pet. denied).

[46] *Abshire*, 563 S.W.3d at 224 (quoting *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017)).

to be delivered in a buttocks-down position. The report also explains why, had Carolina had a cesarean, the baby would have lived. The report traces the failure of the hospital's nurses to convey critical information about Carolina's history to Dr. Hendryx in a timely manner to the delays that prevented a surgical procedure that Dr. Roberts' report indicated would have saved the baby's life.

We conclude that Dr. Roberts' report provides a straightforward link between the treatment that Carolina received from Kingwood Medical and her baby's death.[47] We further conclude that the opinions that Dr. Roberts expressed in his report are not overly conclusory, as the facts that Dr. Roberts relied on in the medical records are tied to his ultimate conclusions.[48]

For the reasons discussed, we overrule the appellants' issues and affirm the trial court's order.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on June 4, 2018
Opinion Delivered March 7, 2019

Before McKeithen, C.J., Kreger and Horton, JJ.

---

[47] *See id.* at 227.

[48] *See Wright*, 79 S.W.3d at 52.

25