**Opinion issued November 5, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00852-CV

———————————

**EARL MANGIN, JR., M.D. AND
ZBIGNIEW WOJCIECHOWSKI, M.D., Appellants**

**V.**

**MELISSA WENDT, INDIVIDUALLY, AND AS EXECUTRIX OF THE
ESTATE OF DONALD WENDT, DECEASED, AND ERIN WENDT,
Appellees**

---

**On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2014-05029**

---

### OPINION CONCURRING IN PART AND DISSENTING IN PART

This is an interlocutory appeal from the trial court's order denying the defendant-physicians' motions to dismiss under the Medical Liability and

Insurance Improvement Act ("MLIIA") for failure of the plaintiffs to file an expert report meeting the requirements of Texas Civil Practice and Remedies Code sections 74.351 and 74.401 with respect to their acts of medical negligence.

Although the majority has recited the correct standard of review, it has ignored that standard in conducting its analysis. It subjects the three expert reports to a rigorous de novo review rather than the review for abuse of discretion called for by the Civil Practice and Remedies Code, and it construes the statutory requirements for medical malpractice expert reports and the judicial requirements for proving the reliability of experts so strictly as to assure the dismissal with prejudice of many meritorious claims at the expert report stage–that is, prior to discovery—rather than to deter the bringing of frivolous claims, as intended by the expert report requirement.

Returning this case to the trial court so that the plaintiff may attempt to surmount the virtually insurmountable hurdles the majority has created for establishing the reliability of expert reports creates the very real possibility of dismissal with prejudice of all claims against the cardiologist whose act of alleged negligence in severing the patient's artery during emergency placement of a stent initiated the chain of negligent acts that together directly and proximately caused the death of the patient from prolonged lack of oxygen to the brain. And this is so even though, under a reasonable reading of controlling law, all three expert reports

fully satisfy the requirements of the Texas Civil Practice and Remedies Code, and all three expert witnesses are reliable.

The majority concomitantly fails to appreciate or adequately address the situation in which, as here, more than one physician's negligence was a proximate cause of a patient's harm. It thus ignores the fact—repeatedly referenced in each of the three medical reports—that the death of the patient, Donald Wendt, from lack of oxygen to the brain following an emergency catheterization procedure was proximately caused by both the initial rupturing of the left anterior descending coronary artery ("LAD") by the emergency cath lab cardiologist, Dr. Earl Mangin, during placement of the stent and the failure of the cardiologist to get the heart pumping again as blood pooled up in a tamponade in the pericardial sac so that Wendt's heart could not pump blood to his brain. And the majority likewise ignores the significance of the fact that each expert opined that it was the *delay* in getting oxygen to Wendt's brain for well over an hour in the cath lab while CPR was performed that was the cause of Wendt's death—not any one specific act of any one person.

The trial court found the three expert reports adequate as to both Dr. Mangin, the cardiologist who placed the emergency stent in Wendt's heart and ruptured his LAD, and Dr. Zbigniew Wojciechowski, the attending anesthesiologist in the emergency cath lab. The majority holds that two of the three

3

expert reports—those of anesthesiologists Dr. Abdul Q. Memon and Dr. Willliam J. Mazzei—are sufficient to allow the case to proceed against Dr. Wojciechowski for his acts and omissions in treating Wendt at Sugar Land Methodist Hospital on January 9, 2012, two days after his admission for chest pains. The majority, therefore, affirms the trial court's denial of Dr. Wojciechowski's motion to dismiss.

However, the majority also concludes that the expert report of Dr. Paul W. Dlabal, a practicing cardiologist, is not an objective good faith effort to comply with the statute as to Dr. Mangin, also a cardiologist. And it concludes that the expert report of anesthesiologist Dr. Mazzei is, likewise, not an objective good faith effort to comply with the requirements for an expert report as to Dr. Mangin. It then finds that the expert report of Dr. Memon, an anesthesiologist certified as an "advanced Cardiac Life Support Provider," is deficient as to Dr. Mangin on several grounds, but principally, in its view, for failing to establish Dr. Memon's credentials to opine on the standard of care of a cardiologist. It, therefore, reverses the trial court's order denying Dr. Mangin's motion to dismiss and remands the case against Dr. Mangin with instructions to the court to afford the Wendts an opportunity to cure, if possible, the deficiency in Dr. Memon's report within thirty days.

I cannot conclude on these facts and the substance of these three expert reports—when there are multiple acts of negligence specifically attributable to more than one defendant that together proximately caused the harm on which a medical liability suit is based—that either of the two defendants, Dr. Mangin or Dr. Wojciechowski, is entitled to dismissal of the claims against him with prejudice in advance of discovery and without a trial on the merits on the ground that the expert reports did not contain enough information to satisfy the *appellate* court—not the trial court—as to the specific act by that physician that by itself directly caused the harm on which the suit is based. Finding all of the reports adequate, either individually or when read together, as expressly permitted by both the plain language of Civil Practice and Remedies Code section 74.351(i) and by controlling authority, I would affirm the trial court's denial of both doctors' motions to dismiss.

I believe the majority has, in its analysis of this case, elevated the standard of appellate review of medical expert reports far above the standard abuse of discretion by the trial court established by the Texas Supreme Court, and its opinion repeatedly contradicts that standard. I also believe that the majority opinion contradicts controlling Texas Supreme Court precedent and puts this Court on a conflict course with our sister intermediate appellate courts—and even with past decisions of this Court—that will inevitably lead to arbitrary and inconsistent

5

opinions regarding the adequacy of medical expert reports, with great harm to the law.

The issues in this case are especially important because, under the MLIIA, expert reports are a statutory *threshold requirement* for maintenance of a suit for medical negligence against a physician. Therefore, dismissal of a claim for failure to satisfy the standards of section 74.351 is with prejudice and entitles the defendant to attorney's fees. Thus, if the appellate courts are falling into disagreement as to what those standards require, it is important that the supreme court clarify what is required to satisfy the threshold requirement of statutorily sufficient expert reports—especially in cases with multiple defendants, each of whom committed an act of negligence that was a proximate cause of harm to the patient—to show that the plaintiff's case is meritorious so that the case can proceed to discovery and trial on the merits. It is equally important that the supreme court further clarify the abuse of discretion standard of appellate review of medical expert reports.

## Medical Expert Reports under Civil Practice and Remedies Code Chapter 74

### A.     *Civil Practice and Remedies Code Sections 74.351 and 74.401*

The Civil Practice and Remedies Code provides:

In a health care liability claim, a claimant shall, not later than the 120th day after each defendant's original answer is filed, serve on that party or the party's attorney one or more expert reports, with a

6

curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. The date for serving the report may be extended by written agreement of the affected parties. Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the later of the 21st day after the date the report is served or the 21st day after the date the defendant's answer is filed, failing which all objections are waived.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp. 2014). If the claimant fails to serve the physician with an expert report, the trial court shall enter an order dismissing the claim "with prejudice to the refiling of the claim" and awarding reasonable attorney's fees and costs. *Id.* § 74.351(b). However,

If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency. If the claimant does not receive notice of the court's ruling granting the extension until after the 120-day deadline has passed, then the 30-day extension shall run from the date the plaintiff first received the notice.

*Id.* § 74.351(c).

Regarding the qualifications of an expert witness in a suit against a physician, the Civil Practice and Remedies Code provides:

(a) In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a physician who:

(1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

7

(2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

. . . .

(c) In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

(1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim; and

(2) is actively practicing medicine in rendering medical care services relevant to the claim.

(d) The court shall apply the criteria specified in Subsections (a), (b), and (c) in determining whether an expert is qualified to offer expert testimony on the issue of whether the physician departed from accepted standards of medical care, but may depart from those criteria if, under the circumstances, the court determines that there is a good reason to admit the expert's testimony. The court shall state on the record the reason for admitting the testimony if the court departs from the criteria.

*Id.* § 74.401 (Vernon 2011).

## B.    *Standard of Review*

The majority generally recites the correct standard of review of medical malpractice claims as stated by the Texas Supreme Court. The standard is elaborated below to clarify how the statute is to be construed by the appellate courts under controlling law.

8

"Plaintiffs suing on health care liability claims must serve each defendant with an expert report . . . or face dismissal of their claims." *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 42 (Tex. 2013); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (service of expert report required). "A valid expert report under the [Chapter 74] must provide: (1) a fair summary of the applicable standards of care; (2) the manner in which the physician or health care provider failed to meet those standards; and (3) the causal relationship between that failure and the harm alleged." *TTHR Ltd. P'ship*, 401 S.W.3d at 44 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6)). "A causal relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omission, the harm would not have occurred." *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). "[I]t is sufficient that, in their reports, the experts 'state[] a chain of events that begin with a health care provider's negligence and end in personal injury.'" *Id.* at 126 (quoting *McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.)).

"The expert report need not marshal every bit of the plaintiff's evidence," *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006), but it must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010). "While a 'fair

summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *Id.* A medical expert report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011); *Cornejo*, 446 S.W.3d at 120. "No particular words or formality are required, but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556; *Cornejo*, 446 S.W.3d at 123.

A report that merely states an expert's conclusions is insufficient. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). Instead, the expert must provide a basis for his statements and must connect his ultimate conclusions to the facts presented in a particular case. *Id.* A plaintiff may file more than one report to fully satisfy the statutory report requirements. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i); *see also Cornejo*, 446 S.W.3d at 120 ("The expert report requirement may be satisfied by utilizing more than one expert report, and the court may read the reports together.").

When a defendant challenges the adequacy of an expert report, the trial court may grant a motion to dismiss "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statutory definition of an expert report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*). A report qualifies as an objective good faith effort to comply if it meets the two purposes of an expert report in that it (1) informs the defendant of the specific conduct the plaintiff questions, and (2) provides a basis for the trial court to conclude that the plaintiff's claims have merit. *Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012) (citing *Scoresby*, 346 S.W.3d at 556, and *Palacios*, 46 S.W.3d at 879). In determining whether an expert report is an objective good faith effort to comply, a court may look only at the document itself "because all the information relevant to the inquiry is contained within [its] four corners." *Wright*, 79 S.W.3d at 52.

If the court finds the report to be deficient—but nevertheless an objective good faith effort to comply—then it may grant the plaintiff one thirty-day extension to cure the deficiency. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); *Scoresby*, 346 S.W.3d at 557 ("We conclude that a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated.").

11

However, if it appears after a hearing that the report does not represent a good-faith effort to comply with the definition of an expert report or is not sufficiently specific for the trial court to conclude that the claims have merit, the court must dismiss the claims against that defendant. *See Cornejo*, 446 S.W.3d at 120.

Dismissal of a claim against a physician or health care provider for failure to file a timely report meeting the requirements of section 74.351 is with prejudice to refiling the claim against that physician or health care provider and entitles the defendant to attorney's fees. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (b); *see Obstetrical & Gynecological Assocs., P.A. v. McCoy*, 283 S.W.3d 96, 101 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (holding that if plaintiff does not timely serve adequate expert report as to particular defendant in health care liability claim, trial court has no discretion to do anything other than dismiss case with prejudice).

We review a trial court's ruling on a motion to dismiss pursuant to section 74.351 for abuse of discretion. *Palacios*, 46 S.W.3d at 878; *Cornejo*, 446 S.W.3d at 119. *A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. Jelinek*, 328 S.W.3d at 539 (emphasis added); *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Cornejo*, 446 S.W.3d at 119. When reviewing matters committed to the trial court's discretion, the appellate court may not substitute its own judgment for that

of the trial court. *Wright*, 79 S.W.3d at 52; *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992); *Cornejo*, 446 S.W.3d at 119. An appellate court may not reverse for abuse of discretion simply because it would have decided the matter differently. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985); *Cornejo*, 446 S.W.3d at 119.

Moreover, when a party can show that an expert is substantially developed in more than one field testimony can come from the qualified expert in any of those fields. *Broders v. Heise*, 924 S.W.2d 148, 154 (Tex. 1996). The offering party must show that the expert has the "knowledge, skill, experience, training or education regarding the specific issue before the court which would qualify the expert to give an opinion on the particular subject." *Id.* (internal quotations omitted). Absent a clear abuse of discretion, the supreme court will not disturb a trial court's ruling on the qualifications of an witness as an expert. *Id.* at 151.

### Adequacy of Expert Reports of Drs. Mazzei, Dlabal, and Memon

Dr. Mangin was the cardiologist who perforated the artery of the deceased, Donald Wendt, while performing an angioplasty and implanting a stent. Dr. Wojciechowski was the anesthesiologist on duty in the emergency catheterization lab when Wendt was taken there, and he "prepared and signed the anesthesia report indicating he was present during the procedure." It remains unclear which part of Wendt's care Dr. Wojciechowski provided, however, because a medical record

also indicates that "Dr. Smith"—who appears to be Dr. Stetch—was also "an anesthesiologist during the relevant periods" Wendt spent in the emergency cath lab.

In three issues, Dr. Mangin argues that the reports were inadequate as to him because (1) an anesthesiologist—which two of the experts are—is not qualified to opine on the standard of care for an interventional cardiologist, (2) the reports did not state the applicable standard of care or the manner in which he allegedly breached it, and (3) the reports failed to explain how a breach of the standard of care caused the Wendts' injuries.

In one issue, Dr. Wojciechowski argues that the trial court erred by denying his motion to dismiss because the reports are so deficient as to constitute no report as to him.

I would hold that all of the expert reports read singly and together satisfy the requirements of sections 74.351 and 74.401 as to both defendants.

### A. Expert Report of Dr. Mazzei

The majority cursorily dismisses the expert report of anesthesiologist Dr. Mazzei with respect to Dr. Mangin. The majority opines that "Dr. Mazzei's report made no assertions and drew no conclusions relevant to Dr. Mangin or to any cardiologist generally" and thus "standing alone this report did not satisfy any of

14

the three statutory expert report requirements as to Dr. Mangin." Slip Op. at 7–8. It concludes the report was adequate as to Dr. Wojciechowski. *Id*. at 24–25.

To provide an adequate expert medical report, Dr. Mazzei was required to provide "(1) a fair summary of the applicable standards of care; (2) the manner in which the physician[s] or health care provider[s] failed to meet those standards; and (3) the causal relationship between that failure and the harm alleged," here, Wendt's death from cardiac arrest following his admission to Sugar Land Methodist Hospital. *See TTHR Ltd. P'ship*, 401 S.W.3d at 44 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6)).

Dr. Mazzei opined that he was a physician licensed to practice medicine in California, who had completed "fellowships in vascular anesthesia, thoracic anesthesia, and critical care at the Massachusetts General Hospital in Boston, Massachusetts," that he had been board certified in anesthesiology since April 1987, had practiced at the University of California San Diego School of Medicine since February 1986, was, at the time of the report, "Clinical Professor and Vice Chairman of the Department of Anesthesiology," and "frequently provide[d] anesthesia for adults undergoing cardiac catheterization procedures and [was] thoroughly familiar with ventilation problems that may arise in the course of an emergency." As such, he was "familiar with the standard of care that applies to the Institutions and health care providers in Texas." He thus showed that he was fully

15

qualified to testify as to the standards of care of both institutions and health care providers in Texas with respect to ventilation problems in the handling of an emergency cardiac catheterization.

Dr. Mazzei stated that he had reviewed Wendt's medical records, and he set out the history of his treatment: Wendt entered the emergency room complaining of chest pain and was diagnosed with "acute myocardial infarction." He was "brought emergently to the cardiac catheterization lab where stenoses of the mid and distal LAD [coronary arteries] were found. These were angioplastied and a stent was placed, but the distal LAD was torn and blood began accumulating in the pericardium." Dr. Mazzei recounted the various unsuccessful attempts to establish an airway for Wendt, the use of CPR to attempt to restart his heart, and the eventual surgical intervention that repaired the damage caused to Wendt's artery during placement of the stent and to his liver during CPR.

Dr. Mazzei stated, "Although the surgery was successful, Mr. Wendt had suffered massive anoxic brain damage and expired two days later." He then opined:

> When a patient requires emergency airway management as Mr. Wendt did, the standard of care requires that the anesthesiologist quickly assess the patient's condition, perform an evaluation of the airway, and bring the necessary and potentially needed equipment and drugs to ventilate and intubate the patient. Of primary importance is to assure, regardless of drugs or methods chosen, that the patient remain adequately ventilated. Because of the tear in Mr. Wendt's coronary artery that was thus bleeding into his pericardium, it was reasonable to

16

assume that he could lose consciousness at any moment and then lose the ability to protect and maintain his airway, as well as lose the ability to breathe. Thus, the standard of care required that Mr. Wendt be [placed under anesthesia and] immediately intubated.

Dr. Mazzei stated that Wendt was properly placed under anesthesia, "but the anesthesia provider was unable to intubate using standard laryngoscopy" or by other methods and Wendt's oxygen saturation levels dropped to critical levels. The low saturation levels weakened his heart, which caused cardiac arrest. Dr. Mazzei stated,

> Although the blood leaking into the pericardium made it more difficult for Mr. Wendt's heart to pump, it was the low saturations that caused his heart to arrest. The low saturations were caused by inadequate ventilation. Although the anesthesia provider attempted to ventilate Mr. Wendt, he/she took too much time to re-establish adequate ventilation. This was below the standard of care and led to Mr. Wendt's anoxic brain damage and subsequent demise.

He then summarized:

> Mr. Donald Wendt was a previously healthy 57-year-old white male who suffered an acute myocardial infarction. While undergoing coronary re-vascularization in the cardiac cath lab, his LAD was torn and blood started accumulating around his heart. This prompted the need for emergency airway management, for which an anesthesia provider responded. This provider induced anesthesia which stopped Mr. Wendt from breathing on his own, but then failed to re-establish sufficient ventilation before a cardiac arrest occurred. This failure was below the standard of care, and was the proximate cause of the cardiac arrest that led to anoxic brain damage and ultimate demise.

Dr. Mazzei's expert report clearly satisfies the three expert requirements as to the anesthesiologist, Dr. Wojciechowski, who signed the anesthesiology report,

17

by providing (1) a fair summary of the applicable standards of care; (2) the manner in which the physician or health care providers to Donald Wendt failed to meet those standards; and (3) the causal relationship between that failure and the harm alleged. All of these requirements are explicitly referenced and satisfied in Dr. Mazzei's report. As the majority reaches the same conclusion, I concur with the majority opinion as to Dr. Mazzei's report with respect to Dr. Wojciechowski.

With respect to Dr. Mangin, the report recites Dr. Mazzei's qualifications with respect to testifying as to ventilation problems in the handling of an emergency cardiac catheterization. It then states, "Because of the tear in Mr. Wendt's coronary artery that was thus bleeding into his pericardium, it was reasonable to assume that he could lose consciousness at any moment and then lose the ability to protect and maintain his airway, as well as lose the ability to breathe. Thus, the standard of care required that Mr. Wendt be [placed under anesthesia and] immediately intubated." While the report states that he was properly placed under anesthesia, it also states, "Although the blood leaking into the pericardium made it more difficult for Mr. Wendt's heart to pump, it was the low saturations that caused his heart to arrest. The low saturations were caused by inadequate ventilation." Finally, the report states, "While undergoing coronary re-vascularization in the cardiac cath lab, [Mr. Wendt's] LAD was torn and blood

started accumulating around his heart. This prompted the need for emergency airway management."

I read these statements as expressly implicating Dr. Mangin's act of tearing Wendt's artery during placement of the stent and allowing blood to accumulate around the heart, impeding its ability to pump oxygen to the brain, as being acts below the standard of care that, together with the anesthesiologist's inability to intubate Wendt, and the long delay in getting Wendt to surgery where he could be intubated and his artery repaired, constituted a proximate cause of the loss of oxygen to the brain that caused Wendt's death. *See Cornejo*, 446 S.W.3d at 123 ("[I]t is sufficient that, in their reports, the experts 'state[] a chain of events that begin with a health care provider's negligence and end in personal injury.'"); *McKellar*, 367 S.W.3d at 485 (holding same). And the trial court abuses its discretion only when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Jelinek*, 328 S.W.3d at 539; *Walker*, 111 S.W.3d at 62. I cannot say that the trial court abused its discretion under these standards in finding Dr. Mazzei's report to be adequate as to both Dr. Mangin and Dr. Wojciechowski.

### B. *Expert Report of Dr. Dlabal*

I likewise do not agree with the majority's conclusory two-paragraph dismissal with respect to Dr. Mangin of the report of Dr. Dlabal—like Dr. Mangin

a practicing cardiologist and the only expert cardiologist to opine in the case—as not an objective good faith effort to comply with the statute. Nor do I agree with the majority's failure even to mention Dr. Dlabal's report with respect to Dr. Wojciechowski.

In one paragraph, the majority dismisses Dr. Dlabal's report as made in bad faith with respect to Dr. Mangin. It characterizes the report by saying only,

> Dr. Dlabal's report reviewed and summarized the medical records from the two days Mr. Wendt was in the hospital before his death. He opined that the cause of death was loss of oxygen to the brain, a consequence of complications of treatment for a heart attack—in particular the perforation of a coronary artery. As to causation, he wrote: "The primary cause of death was cerebral anoxia. Had coronary perforation and its attendant complications not occurred in the course of treatment, the underlying condition was, in reasonable medical probability, survivable."

Slip Op. at 8. On the basis of this characterization, the majority concludes:

> This report fails to satisfy the statutory requirements because it did not identify any applicable standards of care, assert that Dr. Mangin failed to comply with an applicable standard of care, or explain how a departure from an applicable standard of care caused Mr. Wendt's death. *See* [TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6)]. Because Dr. Dlabal's report merely summarized the medical records, it did not inform Dr. Mangin of the conduct that the plaintiffs had questioned nor did it provide a basis for the trial court to conclude the claims have merit. *See Palacios*, 46 S.W.3d at 879.

*Id.* I do not agree with this characterization of the report or with the majority's conclusion.

Despite the majority's contention, Dr. Dlabal not only summarized Mr. Wendt's medical records, he also opined that the cause of death was loss of oxygen to the brain (cerebral anoxia), which was a consequence of complications of treatment for a survivable heart attack, "in particular the perforation of a coronary artery." He described in detail how the negligent actions of both the attending cardiologist and the attending anesthesiologist—neither of whom he identified by name—caused Wendt to lose oxygen to the brain for a prolonged period of time.

As stated in his report, Dr. Dlabal is "board certified in Internal Medicine and Cardiovascular Diseases, and [has] been in the active practice of cardiology since 1980." He incorporated his curriculum vitae by reference. He further stated:

> In my practice as a cardiologist, I have evaluated and treated numerous patients who presented with the symptoms and signs as exhibited by Donald Wendt on 2/7/12. In particular, I have evaluated and treated over 2500 patients who presented in an emergent condition suggestive of acute myocardial infarction, including numerous patients with acute anterior and anterolateral myocardial infarction. I am intimately familiar with the evaluation, treatment, and prognosis for patients presenting symptoms and signs as shown in the records for this patient.

He stated that his opinion was based on information in the medical records he had reviewed but was "not limited thereto and is subject to change should additional findings be brought to bear on this matter."

Dr. Dlabal recited the history of Wendt's treatment in the emergency and operating room. He stated that Wendt presented at the Sugar Land Methodist

21

Hospital with chest pain of less than two hours' duration. The initial examination showed hypertension and tachycardia, and he "was taken emergently to the catheterization laboratory where he was found to have high-grade stenosis at the level of the mid and distal left anterior descending (LAD) coronary artery." A stent was placed in the LAD lesion, but the distal LAD was perforated during the procedure, "with intrapericardial bleeding" caused by the perforation, which caused "pericardial tamponade." This is a life-threatening situation in which the heart is so filled with fluid that it cannot expand and pump oxygen to the brain. It was also an act of malpractice that was the first step in causing Wendt's death, without which, in Dr. Dlabal's opinion based on "reasonable medical probability," he would not have died. At this time, Dr. Mangin was in charge of Wendt.

A cardiovascular surgeon and anesthesiologist were called. Dr. Dlabal devotes a paragraph to the fumbling around of the anesthesiologist, "[d]uring [which] time the patient progressively deteriorated into hypotension and cardiac arrest for which CPR was initiated," with oxygen saturation dropping to 70%, and, "[i]n all, CPR continued for nearly 60 minutes."

Dr. Dlabal's report states that, after that, the patient was taken to the operating room, a laceration in the liver caused by the CPR was repaired, and "[a]n intraaortic balloon pump . . . was placed for circulatory support," but "[m]ultiple postoperative complications were noted including atrial fibrillation, respiratory

22

failure, abnormal liver function test, and anoxic brain injury secondary to hypoxemia [abnormally low oxygen in the blood] and prolonged shock." The patient showed "anoxic encephalopathy," or brain damage due to cardiac arrest, "and did not regain consciousness."

On the basis of those facts, Dr. Dlabal gave his "Medical Opinion Regarding Causation":

> As a consequence of intraoperative complications of coronary perforation, hypoxemia associated with hypotension, cardiac tamponade and circulatory collapse requiring prolonged CPR, the patient suffered irreparable brain damage on the basis of cerebral anoxia. Despite cardiovascular recovery from myocardial infarction, cardiogenic shock and cardiac arrest, the patient's brain did not recover function, nor did he regain consciousness. The primary cause of death was cerebral anoxia. *Had coronary perforation and its attendant complications not occurred in the course of treatment, the underlying condition was, in reasonable medical probability, survivable.*

Report of Dr. Dlabal (emphasis added).

As with Dr. Mazzei's report, I, unlike the majority, cannot conclude that the trial court abused its discretion by finding Dr. Dlabal's expert report adequate. *See Palacios*, 46 S.W.3d at 878; *Cornejo*, 446 S.W. 3d at 119; *see also Jelinek*, 328 S.W.3d at 539 (trial court abuses its discretion if it acts by arbitrary or unreasonable manner without reference to any guiding rules or principles); *Wright*, 79 S.W.3d at 52 ("When reviewing matters committed to the trial court's

discretion, the appellate court may not substitute its own judgment for that of the trial court.").

Dr. Dlabal, on the basis of a great deal of experience in treating "over 2500 patients who presented in an emergent condition suggestive of acute myocardial infarction," effectively reports that Dr. Mangin, the cardiologist who placed the stent, fell below the standard of care of a cardiologist by perforating Wendt's artery, causing blood to fill the sac around the heart and compress the heart so that it could not expand, causing "hypoxemia associated with hypotension," or loss of oxygen to the brain. I do not find it necessary that the expert report explicitly say that this is below the standard of care of a cardiologist in charge of a patient in an emergency cardiac cath lab in whose heart he has just placed a stent, because his expert report leaves room for no other conclusion than that the initial proximate cause of Wendt's need to have ventilation restored to his brain was the perforation of his LAD by Dr. Mangin that caused blood to fill the pericardial sac so that Wendt's heart could not compress and pump oxygenated blood to the brain.

Dr. Mangin was in charge of the patient's care from the moment the patient entered the emergency room for placement of the stent. He caused the initial injury by tearing Wendt's artery, causing blood to pool up around the heart so that it could not pump oxygen to the brain. This situation occasioned the need for emergency repair of the ruptured artery and for oxygenation to keep the patient

24

alive until that situation could be corrected, as Dr. Dlabal's report states. Dr. Dlabal's report makes it obvious that Dr. Mangin failed to carry out this responsibility.

Section 74.351(r) requires only that a medical expert's report provide "a fair summary of the expert's opinions . . . regarding applicable standards of care," identify "the manner in which the care rendered by the physician or health care provider failed to meet the standards," and contain an explanation of the "causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Dr. Dlabal stated, "Had coronary perforation and its attendant complications not occurred in the course of treatment, the underlying condition was, in reasonable medical probability, survivable." Thus, Dr. Dlabal's opinion necessitates the conclusion that the perforation of Wendt's artery—done by Dr. Mangin—was the initial cause of all the complications that followed and was therefore a proximate cause of his death.

Likewise, Dr. Dlabal clearly sets out, in much greater detail than I have here, the many missteps committed by the anesthesiologist in getting oxygen to Wendt's brain once his heart ceased to be able to pump the blood—missteps that included "esophageal intubation," instead of intubation of the lungs to bring air to them, causing a need for "bag valve-mask ventilation and ultimately . . . tracheal intubation." During all this time, Wendt's blood oxygen level was falling into the

25

danger zone and his condition "progressively deteriorated into hypotension and cardiac arrest for which CPR was initiated," and CPR was continued for nearly an hour before Wendt was taken to the operating room where the coronary perforation was repaired. Thus, the surgical repair happened so late that Wendt suffered "atrial fibrillation, respiratory failure, abnormal liver function test, and anoxic brain injury secondary to hypoxemia and prolonged shock," resulting in death.

I call this a clear statement of acts below the professional standard of care of both the cardiologist and the anesthesiologist charged with Wendt's care that directly caused Wendt's death. But the majority, in its review of the expert report, refuses to translate the medical language used or to draw any reasonable inferences from the physician's statement. Most importantly, it fails to take into account the basic premise of law that an injury may have more than one proximate cause, as proximate cause is nothing but cause in fact plus foreseeability. *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005) ("Proximate cause has two elements: cause in fact and foreseeability," both of which must be established by evidence; "The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred."); *Aleman v. Ben E. Keith Co.*, 227 S.W.3d 304, 310 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("Foreseeability exists if the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act creates for others."). In the medical

report context specifically, "[a] causal relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omission, the harm would not have occurred." *Cornejo*, 446 S.W.3d at 123. And it fails to follow the established standard for appellate review of a trial court's ruling on the sufficiency of a medical expert report: Did the trial court act without reference to any guiding rules or principles in determining that the report was sufficient. *See Jelinek*, 328 S.W.3d at 529.

In summary, the majority refuses to recognize that an injury in a medical malpractice case may have more than one cause—that it may result from more than one negligent act, with both being substantial factors in causing the harm in that the harm would not have occurred without both acts of negligence. Yet this court has specifically recognized that possibility in previous cases. *See Cornejo*, 446 S.W.3d at 123 ("[I]t is sufficient that, in their reports, the experts 'state[] a chain of events that begin with a health care provider's negligence and end in personal injury.'") (quoting *McKellar*, 367 S.W.3d at 485).

In my view, nothing more is required to satisfy all the requirements of section 74.351(r) than that the expert report show the three elements of negligence—duty, breach, and proximate causation of injury—are satisfied. I cannot agree that construction of the statute requires a reviewing court to disregard reasonable inferences from expert statements that establish the duty or standard of

care, the failure to meet that standard, and the causal relationship between the breach and the injury. And I cannot agree that, in finding Dr. Dlabal's report to be sufficient, the trial court acted arbitrarily and capriciously and without reference to any guiding rules or principles.

Thus, I do not agree with the majority that the trial court abused its discretion by accepting Dr. Dlabal's report as adequate as to Dr. Mangin. To me, it is a necessary inference from the facts and opinions stated in Dr. Dlabal's report that it is below the professional standard of care of a cardiologist to perforate an artery, causing blood to accumulate in the pericardium and the heart to be unable to beat to aerate the blood, which was a life-threatening situation that caused Wendt's heart to stop beating and was allowed to persist for at least an hour before surgical intervention repaired the defect. It is likewise below the standard of professional care for an anesthesiologist to intubate a patient's esophagus instead of his lungs, to take so long to intubate the patient that his blood oxygen level causes brain damage, and then for medical personnel to try CPR for an hour in the presence of both the cardiologist and the anesthesiologist before taking the patient into surgery to repair the tear and restore circulation of oxygen to his brain. Dr. Dlabal's report supports the conclusion that all of these acts constituted departures from the professional standard of care of a physician; and each of them was a proximate cause of the "injury, harm, or damages claimed"—brain damage and death due to

low oxygen caused by the unprofessional injury to Wendt's coronary artery, the maladroit intubation, and the great lapse of time before taking Wendt to the operating room and performing the necessary procedures to restore oxygen to his brain.

I note that, in stating the standard of care, breach, and causation, "[n]o particular words or formality are required," and Dr. Dlabal's report offers much more than "bare conclusions." *See Scoresby*, 346 S.W.3d at 556; *Cornejo*, 446 S.W.3d at 123. However, even if section 74.351 required Dr. Dlabal to explicitly opine that the standard of care does not permit these failures and that they are below the standard of care of a reasonably prudent physician performing the tasks Dr. Mangin and Dr. Wojciechowski did perform (whether individually or in a supervisory capacity, or whether by simply standing by without taking the necessary steps to restore aeration to Wendt's blood before he suffered irreversible brain damage due to loss of oxygen is unclear), I could not opine, as the majority does, that Dr. Dlabal's expert report is not an objective good faith effort to comply with the statute. *See* Slip Op. at 8.

### C.    *Expert Report of Dr. Memon*

Lastly, the majority considers the report of Dr. Memon, who like Dr. Mazzei is an anesthesiologist. As with the other reports, the majority applies far too stringent a standard of review to Dr. Memon's qualifications to opine on Dr.

Mangin's treatment of Wendt, in my view. It also finds the report deficient as to Dr. Mangin, although adequate as to Dr. Wojciechowski. I would find it adequate as to both.

The majority acknowledges that, "[t]o determine whether a witness is qualified based on his training and experience," a trial court must consider whether the witness is "board certified or has other substantial training or experience in an area of medical practice relevant to the claim" and whether he "is actively practicing medicine in rendering medical care services relevant to the claim." Slip Op. at 9 (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c)).

It further acknowledges that "[t]he critical inquiry is 'whether the expert's expertise goes to the very matter on which he or she is to give an opinion." *Id.* at 10 (quoting *Broders*, 924 S.W.2d at 153). Thus a physician may be qualified to provide an expert report even when his specialty differs from that of the defendant "if he has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those confronting the malpractice defendant," or if "the subject matter is common to and equally recognized and developed in all fields of practice." *Id.*; *accord Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). For example, courts of appeals have held that experts whose specialty differed from that of the defendant were qualified when the alleged breach involved: a home health care worker's failure to

recognize and act upon signs of a true medical emergency, *IPH Health Care Servs., Inc. v. Ramsey*, No. 01–12–00390–CV, 2013 WL 1183307, at *10 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.); general surgical practices such as preoperative and postoperative counseling and care, *Keo*, 76 S.W.3d at 733; post-operative infection, *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.); and taking a medical history and giving discharge instructions, *Hersh v. Hendley*, 626 S.W.2d 151, 155 (Tex. Civ. App.—Fort Worth 1981, no writ).

However, the majority fails entirely to take into account the rest of *Broders'* instruction. In that case, the supreme court held that when a party can show that an expert is substantially developed in more than one field, testimony can come from the expert in any of those fields. *Broders*, 924 S.W.2d at 153–54. The offering party is required to show that the expert has the "'knowledge, skill, experience, training or education' regarding the specific issue before the court which would qualify the expert to give an opinion on the particular subject," but he is not required to do more; and, absent a clear abuse of discretion, the supreme court will not disturb a trial court's decision on the qualifications of a witness as an expert. *Id.* There was no such clear abuse of discretion here.

Dr. Memon's expert report states, among other things, that he is a physician licensed to practice in five states, received his Texas medical license in 1977, has

been certified by the American Board of Anesthesiology since 2000, is a fellow of the American College of Anesthesiology, is certified by the American Heart Association as an Advanced Cardiac Life Support Provider, has been certified by the American Heart Association as a Healthcare Provider, and is familiar with the standard care that applies to physicians and institutions in Texas. It further states,

> As a practicing anesthesiologist, I am experienced in the preoperative evaluation, airway management, including placement of an Endotracheal tube ("ETube"), and administration of anesthesia to patients undergoing surgical procedures, including cardiac procedures. Further, I am familiar with the possible complications that can arise during treatment of an acute myocardial infarction and the remedial measures necessary if such complications arise.

The report further states:

> I also am familiar with and have substantial knowledge of the causal relationship between an anesthesiologist's and general and traumatic surgeon's failures to meet the reasonable, prudent, and accepted standards of medical care and supervision in the diagnosis, care, and treatment of patients requiring ventilation and/or undergoing general anesthesia for cardiac surgical procedures under both planned and emergent conditions.

The report states that Dr. Memon's opinions were based upon, but were not limited to, Wendt's medical records at Sugar Land Methodist Hospital on February 7 to February 9, 2012 and that "[t]he opinions expressed herein as to causation are based on reasonable medical probability."

Dr. Memon opined with respect to Dr. Mangin:

> In my opinion, the accepted Texas standards of medical care applicable under similar circumstances involved *in airway*

32

*management, necessitated by the complication of a ruptured artery during cardiac procedures and subsequently including emergent placement of an ETtube, requires that the patient's condition be quickly assessed, necessary equipment and drugs be made available immediately, a viable airway be established promptly and adequate ventilation be maintained during the course of any procedures. The cardiologist's report clearly states that the ETtube was incorrectly placed.* No one record shows how long the tube remained incorrectly place in the esophagus. *The records do not show that anyone confirmed that the ETtube was in the correct place by either listening at the chest, a standard procedure in such cases.* Finally, the records do not show how long it took to correct any mistakes and resume adequate ventilation after the initial failure to properly intubate the patient. The records do show, however, that *Donald Wendt was without a sufficient Oxygen saturation for significant periods of time during the cardiac incidents, had blood oxygen levels at a level low enough to cause organ damage for a prolonged period of time, prior to being brought to the surgical OR.*

An esophageal intubation is not an uncommon complication for an anesthesiologist, *but a failure to promptly notice the incorrect placement and/or the failure to perform tests verifying correct placement and promptly correct the ETtube placement or otherwise ventilate the patient, and not establishing a viable airway quickly is a departure from the standard of care.* Dr. Mangin's record states that the anesthesiologist incorrectly placed the ETtube in the esophagus, citing air in the stomach, and does not mention how long it took Dr. Smith[1] to monitor and correct the placement.

---

[1] Dr. Memon pointed out in a footnote that,

[w]hile the records show that Dr. Wojciechowski was the anesthesiologist of record during cardiac surgery performed in the operating room and was present for the administration of general anesthesia and throughout that treatment on the morning of February 7, 2012, the nurse's notes from the catheterization lab reference that Dr. Smith had arrived, intubation was attempted, and Dr. Smith was to complete the notes on intubation. While the signature on the handwritten anesthesiology report is difficult, if not illegible, it is logical that it was prepared by the Dr. Smith who was called to the cath lab by Dr. Mangin and who performed the procedures prior to

33

As an anesthesiologist, I am familiar with the need to establish both a viable airway and sufficient blood flow to maintain necessary oxygen levels in the body and prevent organ damage during cardiac procedures. In my opinion, *the accepted standards of medical care applicable to Dr. Mangin* under similar circumstances involving the treatment of a patient with an acute myocardial infarction ("MI"), but who is alert and ambulatory, generally *requires transfer of the patient to the cath lab for an angiography and stent insertion. However, the standard of care requires that the doctor who administers the sedation holds hospital privileges to do so.* Further, *while not very common, a ruptured artery and cardiac tamponade are known complications of a stent insertion, and the doctor performing the procedure should be prepared to promptly deal with such complication by, for example, draining a tamponade to re-establish proper circulation to essential systems.*

In the case of Donald Wendt, the records show that, despite conscious sedation administered at the cath lab, *the patient's pain and agitation increased significantly after the initial attempt to place a stent, resulting in a decision to call an anesthesiologist* for general anesthesia and intubation. *However, the records show that Dopamine was administered to the patient, a sign that Donald Wendt was in cardiac distress and low blood pressure, well before any calls for specialists were made. Specialists such as an anesthesiologist or a cardiac surgeon should be called as soon as any problem is apparent.* In the case of Donald Wendt, *Dopamine was administered at 3:45 am* according to the records, showing hypotension, prior to any call for either the anesthesiologist, at 3:49 am, or the cardiac surgeon at 4:10 am. *The cardiac surgeon did not arrive until 4:22 am, significantly after Donald Wendt's heart had stopped and CPR had been performed, and at which time the patient's blood oxygen levels had reached a low enough level to result in organ damage. As pericardiocentesis was not performed until after the cardiac surgeon*

---

Donald Wendt's transfer to the operating room. Further, if an anesthesiologist was not present at the time of initial intubation attempt, that of itself could be a serious departure from the standard of care and shift liability onto the doctor who proceeded before the anesthesiologist was present.

*had arrived, it leaves open the question of whether Dr. Mangin knew how to drain a tamponade? And, if he was not qualified to address this possible complication, why did Dr. Mangin choose to do a procedure with that risk? Further, Donald Wendt's medical records do not show when Dr. Mangin noticed the ruptured coronary artery; a failure to promptly notice the rupture and take steps to prevent further damages is a deviation from the standard of care.* From the records, it can be seen that *the cardiac surgeon was not called for by Dr. Mangin until 25 minutes after cardiac complications set in.* The cardiac surgeon's arrival at the cath lab, after the delay in being called and the time needed to arrive, *was a considerable time after the initial complications became obvious* (as can be determined by the administration of emergency drugs, such as Dopamine discussed above*), at which time it is medically likely that an acute tamponade had occurred, preventing sufficient blood flow to vital organs, including the brain.*

A ruptured coronary artery and cardiac tamponade are not common complications, however, there is a significant chance of adequate survival if aggressive treatment is immediately offered. *If Dr. Mangin timely recognized the arterial rupture, and had he promptly performed a pericardiocentesis, a procedure performed by emergency medical professionals and cardiologists certified in the procedure as well as by cardiac surgeons, and maintained blood flow to Donald Wendt's brain and other organs, given adequate ventilation, it is my opinion, to a reasonable degree of medical probability, that he would not have suffered the period of hypoxia that left him brain dead.*

In summary, Donald Wendt came to [Sugar Land Methodist Hospital] walking alert and quite healthy for his age except for chest pain and left the hospital dead two days later, having never regained consciousness. In my opinion, *the patient was brain damaged by the prolonged hypoxia and prolonged low Oxygen saturation that could happen when Donald Wendt suffered esophageal intubation, cardiac tamponade and ruptured coronary artery, which are serious complication of a cardiac procedure. Any or all of these complications must be addressed promptly to avoid prolonged hypoxia, brain damage, and death, but if recognized and remedied quickly there is a reasonable certainty that the patient will have adequate recovery.* During the procedures in the cath lab, Donald

Wendt was hypoxic for a long enough time to become significantly brain damaged and unable to recover.

(Emphasis added.)

In my view, the majority opinion does not accurately reflect either Dr. Memon's credentials or the content of his report. Consequently, it finds deficiencies where none exist on an objectively reasonable reading of the report. The majority states, "In his report, Dr. Memon stated that the applicable standards of care required Dr. Mangin to be prepared to 'promptly deal with' a ruptured artery and cardiac tamponade, both of which are known complications of a stent insertion, and to call for specialists such as an anesthesiologist or cardiac surgeon 'as soon as any problem is apparent.'" Slip Op. at 10–11. The majority then opines, "With respect to the first of these proposed standards of care, Dr. Memon's report raised a question about whether Dr. Mangin knew how to drain a tamponade, but he did not actually offer an opinion that Dr. Mangin was unqualified to perform a stent insertion." *Id.* at 11. Rather, the majority construes the report as suggesting that "Dr. Mangin may have erred by choosing to perform a risky procedure if he was unqualified to perform it." *Id.* With respect to the second of these proposed standards of care, the majority summarizes Dr. Memon's observations about the administration of Dopamine to Wendt at 3:45 am and noted his characterization of that treatment "as 'a sign' that Mr. Wendt 'was in cardiac distress' and had 'low blood pressure.'" *Id.* The majority states, "Dr. Memon's report opined that if Dr.

36

Mangin had promptly noticed the ruptured artery, performed pericardiocentesis, and maintained blood flow to the brain, Mr. Wendt 'would not have suffered the period of hypoxia that left him brain dead.'" *Id.* at 11–12.

The majority, in finding this report deficient, picks bits and pieces of Dr. Memon's opinion out of the fact-intensive context in which they are found and raises them to the *sine qua non* of an adequate expert report. Among other problems, the majority ignores the several aspects of the standards of care of a cardiologist charged with the emergent care of a cardiac patient that Dr. Memon did actually assign to Dr. Mangin—which, along with the breaches of these standards, are italicized in the report as set out above. And it misconstrues the import of what Dr. Memon did include in his opinion. The question regarding whether Dr. Mangin knew how to drain a tamponade is *not* raised because Dr. Memon is opining that he knows how to drain a tamponade and Dr. Mangin does not. It is raised as one possible reason for the tamponade's being allowed to increase over a prolonged period of time to the point where Wendt's heart stopped and he had no supply of oxygen to the brain for a long time before Dr. Mangin called someone capable of dealing with the problems he was experiencing with the patient.

It is not necessary for the report to set out the exact reason for each of the delays that Dr. Memon repeatedly says fell below the standard of care of both the

cardiologist in the room—Dr. Mangin—and the anesthesiologist in the room—Dr. Wojciechowski—and that together proximately caused the lack of oxygen to the brain that caused Wendt, an otherwise healthy 57-year-old, to suffer organ failure and death. Those issues are to be discovered and presented at trial. All that is required for the adequacy of the expert report is for a qualified expert to have set out the standard of care, the facts constituting breach and causation, and the injury or damage caused by the breach. Those criteria were satisfied here.

The majority, however, having questioned Dr. Memon's knowledge of how to drain a tamponade, next claims that he lacked the credentials to opine on the standard of care for a cardiologist called on an emergency basis to place a stent in the heart of a man with a blockage in the left anterior descending artery. The majority states, "We must determine whether Dr. Memon's report and CV demonstrate that he is qualified to offer specific expert opinions considering that he is neither board certified in nor actively practicing cardiology." Slip Op. at 12 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c)).

> After reciting Dr. Memon's credentials, it opines,
>
> Although he asserts familiarity with standards of care for "general and traumatic surgeons," Dr. Memon does not make any assertions of expertise pertaining to a cardiologist's duties when providing cardiac care. The report also does not explain whether and how Dr. Memon's knowledge about the standards applicable to "general and traumatic surgeons" applied to the specific breaches that he attributes to Dr. Mangin. Moreover, Dr. Memon's statement that he is "familiar" with the complications that can arise during treatment for acute myocardial

38

infarction and the treatments for such complications is vague and non-specific. In sum, the expert report does not demonstrate how Dr. Memon's knowledge, skill, experience, training, or education qualified him to render an opinion about the particular breaches of the standard of care applicable to a cardiologist when the coronary artery was perforated during the catheterization procedure and during subsequent complications that occurred.

The report also did not establish or even assert that Dr. Mangin's alleged breaches pertained to a subject matter that is common to and equally recognized and developed in all fields of medical practice, such that no specific cardiological knowledge or experience would be required to offer a relevant opinion. *See Broders*, 924 S.W.2d at 153; *Keo*, 76 S.W.3d at 732. Whether a cardiologist who is providing cardiac care to a patient should have sought help from a cardiac surgeon necessarily would depend on what medical care the cardiologist was capable of providing. This implicates a cardiologist's judgment relative to his specialty and is not something common to and equally recognized and developed in all fields of medicine. To the extent that Dr. Memon in fact possesses knowledge as to when a cardiologist should seek assistance from a cardiac surgeon, the basis of such knowledge was not clearly articulated in his report and CV.

Slip Op. at 13–14.

The majority cites no authority for the level of detail it requires to satisfy itself as to whether Dr. Memon is qualified to opine on the standards of care relevant to Wendt's cardiological care, and the majority opinion disregards both the abuse of discretion standard for reviewing an expert report set out in *Jelinek*, *Palacios*, and other cases and the standard set out in *Broders* for assessing the credentials of a physician who is opining as an expert in a field outside his own. The majority specifically recognizes that both Dr. Memon's report and his CV show that he is "certified by the American Heart Association as an Advanced

39

Cardiac Life Support Provider," and he has been "certified by the American Heart Association as a Healthcare Provider (C.P.R. and AED)." Slip Op. at 14. But it ignores Dr. Memon's further statement:

> I also am familiar with and have substantial knowledge of the causal relationship between an anesthesiologist's and general and traumatic surgeon's failures to meet the reasonable, prudent, and accepted standards of medical care and supervision in the diagnosis, care, and treatment of patients requiring ventilation and/or undergoing general anesthesia for cardiac surgical procedures under both planned and emergent conditions.

Thus, I cannot agree with the majority's conclusion that, "[a]lthough Dr. Memon stated that he has provided anesthesia to patients undergoing cardiac procedures, he did not show that his 'expertise goes to the very matter on which he or she is to give an opinion.'" Slip Op. at 15 (quoting *Broders*, 924 S.W.2d at 153).

Nor can I agree with the majority that "[u]nder the specific facts presented here, Dr. Memon's report is deficient because it fails to adequately link the education and experience listed on his CV, his statement that he is familiar with complications that may arise during the treatment of myocardial infarction, and his specific opinions about how Dr. Mangin's alleged errors caused Donald Wendt's death." *Id.* Nor can I find the "logical gaps" the majority claims cannot be filled in by inference. *Id.* (citing *Scoresby*, 346 S.W.3d at 556).

I would heed the supreme court's admonishment that, in determining whether an expert is qualified, we must not draw expert qualifications "too

40

narrowly." *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006). Dr. Memon's report and CV demonstrated that he had experience with the type of treatment Wendt received here and that he was familiar with the applicable standards of care. This is sufficient to qualify him to offer his opinion in this case. *See Hillery v. Kyle*, 371 S.W.3d 482, 487 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (concluding that expert was qualified when he stated familiarity "with the standards of care relevant to the condition involved in this claim" and had "diagnosed and treated patients with conditions similar to those experienced by" plaintiff); *Rittger v. Danos*, 332 S.W.3d 550, 558 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (focusing on condition involved in claim rather than defendant doctor's area of expertise).

The fact that Dr. Memon is an anesthesiologist who routinely works in cardiothoracic settings involving "the diagnosis, care, and treatment of patients requiring ventilation and/or undergoing general anesthesia for cardiac surgical procedures under both planned and emergent conditions," but is not a cardiologist, does not disqualify him as an expert as to either the cath lab cardiologist or the cath lab anesthesiologist in this case. *See Rittger*, 332 S.W.3d at 558; *see also Hayes v. Carroll*, 314 S.W.3d 494, 504–05 (Tex. App.—Austin 2010, no pet.) (holding board certified vascular surgeon was qualified to render opinion on standard of care applicable to emergency room doctor); *Blan v. Ali*, 7 S.W.3d 741, 746–47

(Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding that neurologist was qualified as expert on plaintiff's condition—stroke—even though defendant doctors were emergency room doctor and cardiologist).

The majority, however, finds only that the report was "an objective good faith effort to comply" with the standards for an expert report set out in section 74.351, in that it "summarizes Dr. Memon's opinions on the applicable standards of care, identifies the ways in which he believes that Dr. Mangin breached those standards, and provides an explanation of how these alleged breaches caused Donald Wendt's death" while still finding it "deficien[t] in failing to articulate how Dr. Memon's expertise qualified him to render an opinion relevant to the claims against Dr. Mangin." Slip Op. at 16.

Because I would conclude, unlike the majority, that Dr. Memon's opinion does, in fact, satisfy the requirements of section 74.351, I would not go looking behind obviously qualifying credentials to find some "logical gap" that failed to show *how* he was qualified to opine as he did. Indeed, the Texas Supreme Court has cautioned against exactly that. *See Broders*, 924 S.W.2d at 151 (holding that absent clear abuse of discretion, supreme court will not disturb trial court's ruling on qualification of expert witness). And I certainly would not do scrutinize an expert's credentials and find them inadequate on the basis of a description of his report that mischaracterized what he was actually saying. Thus, for all these

42

reasons, I cannot join the majority's opinion that Dr. Memon's expert report with respect to Dr. Mangin was deficient, and I would not remand the case for the Wendts to attempt to cure the "deficiency" as their sole avenue for avoiding dismissal of Dr. Mangin—the cardiologist whose acts initiated Wendt's immediate need for aeration of the blood to his brain—with prejudice.

## Conclusion

The majority opinion in this case presents a very serious encompassing question for review: whether the standard for reviewing a trial court's determination of the adequacy of medical expert reports and the adequacy of expert credentials is still an abuse of discretion standard or whether this Court is correct to subject the reports to a much more exacting de novo appellate review. And it raises the further critical question of what standard of review applies to expert reports when the proximate cause of a patient's death or injury is not just one negligent act by one physician but a series of negligent acts by different medical personnel together directly and foreseeably caused the death or injury giving rise to the claim.

The majority itself accurately points out that "[t]he requirement to serve an expert report arises at the outset of litigation and before the opportunity for the plaintiff to engage in significant discovery, including the taking of oral depositions of the defendants," and, thus, "the amount and quality of evidence available at the

time of drafting the expert reports will be less than that available at trial on the merits or even the summary-judgment stage." Slip Op. at 23 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (s), *Wright*, 79 S.W.3d at 52 (the report "need not marshal all the plaintiff's proof"), and *Palacios*, 46 S.W.3d at 878). Yet the majority's requirements for expert reports disregard these criteria and the reasoning behind them, with the result that at least as much, if not more, is demanded of the expert report than at the summary judgment or trial stage.

This is a case in which several physicians were participants in a chain of events that began with one physician's negligence—the perforation of the patient's artery by the cardiologist inserting a stent and the resulting pooling of blood around his heart causing the heart to be unable to pump—and ended with that patient's death due to prolonged loss of oxygen to the brain, caused not only by the negligent actions of at least the cardiologist but also by the negligence of at least the anesthesiologist in charge. All of the testifying experts clearly stated that the negligent actions of both defendants were substantial factors in the patient's death. The question for the courts, therefore, is whether, in such a case, to survive the threshold requirements of informing the defendant of the specific conduct the plaintiff has called into question and providing a basis for the trial court to conclude that the claims have merit, the plaintiff must marshal all of his proof as to who did exactly what exactly when—in advance of discovery—rather than seeking

discovery from the defendants who have this information and then trying the case in the courts.

The purpose of the expert report requirements of Civil Practice and Remedies Code sections 74.351 and 74.401 is to deter frivolous suits, not to create an unreasonably high barrier to filing suit. The very strict reading applied by the majority to the expert reports in this case will lead to dismissal with prejudice of suits that appear meritorious before discovery can be had on the merits and trial can test the actual merits of the plaintiff's claim. To my mind, the majority has lost sight of both the statutory standard for adequacy of expert reports and the standard of appellate review of a trial court's determination as to adequacy. And it has lost sight of the reason for those standards—to assure that meritorious suits rather thant frivolous ones go on to discovery and trial.

I would affirm the order of the trial court denying both Dr. Mangin's and Dr. Wojciechowski's motions to dismiss, and I would remand the case for trial against both doctors without requiring the Wendts to "cure the deficiency" in Dr. Memon's expert report served on Dr. Mangin.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Bland, and Massengale.

Justice Keyes, concurring and dissenting.